MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:       2016 ME 24
Docket:         And-13-519
Argued:         May 14, 2015
Decided:        February 2, 2016

Panel:          SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

## STATE OF MAINE

v.

## BUDDY ROBINSON

HJELM, J.

[¶1]  Buddy Robinson appeals from a judgment of conviction of the murder of Christiana Fesmire, 17-A M.R.S. § 201(1)(A) (2015), entered by the trial court (Androscoggin County, *MG Kennedy, J.*) after a jury trial.  Robinson argues that the court erred when it found that he was not unfairly prejudiced by prosecutorial misconduct and that he was denied a fair trial by the court's responses to the jury's request for a read-back during its deliberations.  Although we conclude that the State engaged in misconduct during the trial, we affirm the conviction.

## I.  BACKGROUND

[¶2]  Viewed in the light most favorable to the State, the evidence establishes the following facts.  *See State v. Dolloff*, 2012 ME 130, ¶ 3, 58 A.3d 1032.  In 2009, Robinson and his sister were employed at a business in Lewiston.  There, the sister met Christiana Fesmire.

2

[¶3]  Robinson's sister and her child resided in the second floor apartment of a house that she owned in Lewiston.  In November 2010, Fesmire was looking for a place to live, and the sister offered Fesmire the vacant first floor apartment in her building.  Around that time, Robinson moved into the upstairs unit with his sister and her son.  Robinson's sister ran a prostitution ring and Fesmire began working for her, but in the spring of 2011, she worked less for the sister and spent more time away from the apartment.  On June 28, Robinson's sister told him that Fesmire had told a prostitution client that the sister was operating a prostitution business.  Robinson became upset and said that he was "going to kill" Fesmire.

[¶4]  On June 30, 2011, the sister agreed to lend her Lexus to Fesmire the next day so that Fesmire could drive to a family reunion.  In a text message sent to the sister on the morning of July 1, 2011, Fesmire wrote that she would pick up the car later that morning.  Between 7:00 and 7:30 that morning, the sister left her apartment with a woman who worked for her as a prostitute.  As they were leaving, they saw Fesmire arriving, and the sister had a brief conversation with Fesmire about the location of the car keys.

[¶5]  Robinson's sister and the woman who worked for her went to the premises of the business where the sister worked.  While the sister was there, Robinson used Fesmire's cellular telephone to call his sister and tell her that he had had a fight with Fesmire.  Later that morning, the sister and the woman who

worked for her returned to the sister's apartment, and both of them noticed that the sister's Lexus was still there. Robinson was present and told his sister that he and Fesmire "got into a fight," and that "he took care of the situation." He further stated that Fesmire's body was in the trunk of the Lexus. The woman who worked for Robinson's sister saw that Robinson's pants were wet and heard Robinson say that Fesmire "had thrown up blood everywhere because she was on drugs." After Robinson left to go to work, his sister found splattered blood and a mop in a bucket of bloody water in the kitchen of the first floor apartment. The sister later told the woman who worked for her that Robinson had killed Fesmire and that Robinson "had cleaned it up and put [Fesmire] in the trunk."

[¶6] At approximately 8:00 p.m. that day, Robinson's sister picked him up at their workplace as he finished his shift, and they returned to the sister's apartment. From there, Robinson left again in the Lexus. He returned later that night, and then left his sister's residence with his sister and a friend of his sister to drive to Augusta as part of a planned trip to Presque Isle. The sister drove her Cadillac, and Robinson again drove the Lexus.

[¶7] That night, Robinson sent a series of text messages to a person he had worked with in the Maine Army National Guard. In those text messages, he wrote that "he was a really horrible person," that "he had hurt somebody badly," and "I don't have to worry about her—I will never see her again, I don't have to worry

about her anymore" because "she's dead." He described himself as an "evil person" and wrote that he did not deserve to live.

[¶8] After spending the night in an Augusta motel, Robinson and his sister went to a store where, at Robinson's request, the sister bought paper towels, bleach, and air fresheners. While in the parking lot, the sister smelled a bad odor coming from the trunk of the Lexus after Robinson opened it. They traveled to Presque Isle in the sister's Cadillac, leaving the Lexus at the store and picking it up on their return the next day.

[¶9] When they returned to Lewiston, Robinson, his sister, and two other people went on a planned camping trip. Robinson again drove the Lexus and the others rode in the Cadillac. While camping that evening, Robinson told his sister that "he had to sit on [Fesmire] in the bathtub" and that he had disposed of her body in a "swampy area." During the weekend when they were camping, Robinson's sister sold the Lexus to a friend who was looking to buy a car. Soon after returning from the camping trip, Robinson, the sister, and her son moved out of the apartment where they had been living and relocated elsewhere in Lewiston.

[¶10] Law enforcement officials eventually began investigating Fesmire's disappearance. In September 2011, investigators found blood both in the first floor apartment where Fesmire had lived and in the trunk of the Lexus, and determined that the blood was Fesmire's. The location of the blood in the apartment was

consistent with an effort to clean it up. One week after investigators searched the apartment, they spoke with Robinson and told him they needed to find Fesmire's body. Robinson replied that "he couldn't think straight, and he couldn't remember where he had placed her."

## II. PROCEDURE

[¶11] In November 2011, Robinson was indicted for Fesmire's murder. He pleaded not guilty. A ten-day jury trial was held in November 2012. In his opening remarks, the prosecutor told the jury, "I work for the Attorney General's Office, and my office is in Augusta. Under our law here in the State of Maine, the Attorney General's office is responsible for the prosecution of all the murder cases and that's why I'm here." The prosecutor also made reference to the jurors' role: "Bear in mind, Detective Leighton and I, we've been here before. We've done this before. And having been here before and done this before, we know how frustrating it can be to be in your position." Robinson did not object to these statements. Then, in his closing argument, the prosecutor stated,

> I've been a criminal prosecutor here in the State of Maine pretty much for all of the last 25 years, the last 13 doing exclusively homicide trials for the Attorney General's Office; and, strangely enough, when it comes to trial, I've always been wrong. I'm always wrong. We never get the right person. And, as [defense counsel] told you in his opening statement, once again, we've made a mistake. We've gotten the wrong person.

6

[¶12]  After Robinson argued to the jury that someone else committed the crime, the prosecutor began his rebuttal by saying, "Well, as I told you at the beginning of the first part of my closing argument, I'm wrong again.  We're always wrong.  We never get it right."  Robinson did not object to any of these comments in the State's principal argument or its rebuttal.  After closing arguments, the court instructed the jury that "neither the opening statements nor the closing arguments of the attorneys are evidence" and that

> [a]lthough the statements and the arguments of counsel are helpful to understand their respective perspectives on this case, it is important to remember that ultimately it is your recollection of the evidence and it is your perspective that you developed during the deliberations and during the—during this trial that counts.

[¶13]  The jury began deliberating in the early afternoon.  One-half hour later, the jury sent a note to the court requesting the transcript of the testimony of the woman who worked for Robinson's sister that had been read into the record during the State's case.[1]  In a written response to the jury, the court requested that the jurors identify the portion of the transcript they wished to review.  In writing, the jury responded, "All of it."  The court then sent a second note to the jury indicating that it had "no problem" with the jury reviewing "all of it."  In the note, the court also explained that it would not provide a transcript and that the jury

---

[1] The woman who worked for Robinson's sister was unavailable for trial, and so her testimony from a pretrial bail hearing was read to the jury.

would need to return to the courtroom for a read-back of the testimony. In the same note, the court inquired of the jury, "Are you sure you can't be more specific or at least narrow the scope [of the request] somewhat?" Robinson did not object to the court's notes. The jury did not reply to the court's inquiry, but rather, within an hour after the court sent its second note to the jury, the jury advised the court that it had reached a verdict. The jury returned to the courtroom and delivered a guilty verdict.

[¶14] In October 2013, the court sentenced Robinson to a prison term of fifty-five years and ordered him to pay restitution of $7,923 to the State's Victims' Compensation Fund, *see* 5 M.R.S. § 3360-H (2015), for funeral and counseling expenses that the Fund had covered.

[¶15] Prior to sentencing, Robinson had filed a timely motion for a new trial, *see* M.R. Crim. P. 33,[2] arguing that the evidence was insufficient to support a guilty verdict. For reasons that are not apparent from the record, the motion remained pending even after the court entered judgment against Robinson. In May 2014, Robinson amended the still-pending motion to include an allegation that during his closing argument and while defense counsel was unable to see the

---

[2] The Maine Rules of Unified Criminal Procedure (effective in Androscoggin County on July 1, 2015) were not in effect at the time of these proceedings. *See* M.R.U. Crim. P. 1(e).

8

prosecutor, the prosecutor engaged in gestures and communications that constituted improper contact with the jury.

[¶16] An evidentiary hearing on the motion was held in June 2014.[3] At the motion hearing, Jason Dionne, an attorney who was not otherwise involved in the case, testified that he was present in the courtroom during closing arguments. Dionne testified that as he was observing Robinson's closing argument, he saw the prosecutor respond to defense counsel's rhetorical questions that were designed to demonstrate that Robinson could not have known the information necessary to commit the crime ("How does [Robinson] know that [Fesmire's] going to a family reunion?"). Dionne saw the prosecutor gesture toward Robinson and mouth the words, "He did," or "He did it." Dionne further testified that he saw at least five jurors turn toward the prosecutor.

[¶17] The prosecutor also testified at the hearing and denied any such behavior, stating that he did not intend to send a message to the jury. A detective who had sat next to the prosecutor and a second detective who was in the back of the courtroom during defense counsel's closing argument both testified that they did not see the prosecutor gesturing or attempting to communicate with the jury.

---

[3] Although Robinson filed a notice of appeal in November 2013, the court retained the authority to act on Robinson's motion for a new trial while the appeal was pending. *See* M.R. App. P. 3(b)(1).

[¶18]  During the motion hearing, Robinson also developed evidence that as his attorney was presenting his closing argument, the prosecutor either was or appeared to be sleeping.  During his testimony at the motion hearing, the prosecutor admitted that he likely closed his eyes, put his head back, and feigned sleep in order to annoy defense counsel.  He said, however, that he did not intend for this conduct to be a message to the jury.

[¶19]  In a written order, the court denied Robinson's motion for a new trial, stating that "the only conduct that causes the court even the slightest concern is that described by . . . Dionne."  The court found Dionne's testimony to be equally credible with that of witnesses who contradicted his testimony, and the court therefore did not make affirmative findings on Robinson's allegation that the prosecutor improperly reacted to the questions that Robinson posed during his summation.  The court concluded that Robinson "has not met the burden of demonstrating that the [p]rosecutor's conduct during [Robinson's] closing argument caused a harmful prejudicial error such that substantial justice has not been done."  The court also concluded that the prejudice resulting from any misconduct would have been cured by the court's instructions to the jurors that the statements of counsel are not evidence and that it was their responsibility to decide the issues in the case.  The court also rejected Robinson's argument, set out in his original motion, that the evidence was insufficient to support the guilty verdict.

10

[¶20] Robinson filed a motion for further findings of fact and conclusions of law. Although the court's subsequent order largely described the testimony presented during the motion hearing rather than setting out its own findings, the court stated, "When viewed in isolation and in the aggregate, the court concludes there was no prosecutorial misconduct during [d]efense counsel's closing argument," and that "the interests of justice were protected throughout the trial and that the Defendant received a fair and just trial by jury." Robinson appeals.[4]

## III. DISCUSSION

[¶21] Robinson argues that the court erred by denying his motion for a new trial based on prosecutorial misconduct, and that he was deprived of a fair trial because the court did not fulfill the jury's request for a read-back of the testimony of the woman who worked for Robinson's sister. We consider Robinson's contentions in turn.

A. Prosecutorial Misconduct

[¶22] Robinson argues that the prosecutor made improper comments amounting to prosecutorial misconduct during the State's opening statement and closing argument. Robinson also contends that the prosecutor's behavior during

---

[4] Robinson also filed an application for leave to appeal the sentence, which the Sentence Review Panel denied. *See State v. Robinson*, No. SRP-13-520 (Me. Sent. Rev. Panel Feb. 27, 2014); s*ee also* 15 M.R.S. § 2151 (2015); M.R. App. P. 20.

the defense's closing argument unfairly prejudiced him. Robinson argues that the effect of this misconduct—verbal and physical—was to deprive him of a fair trial and that the court thus erred in denying his motion for a new trial.

[¶23] We begin our analysis of Robinson's claim of prosecutorial misconduct by reiterating that the prosecutor has a unique role in the courtroom. Rather than serving as an advocate for a particular person or entity, the prosecutor is a "minister of justice." M.R. Prof. Conduct 3.8 cmt. (1). Thus, the prosecutor has "a special responsibility in representing the State" to "help ensure a fair trial." *Dolloff*, 2012 ME 130, ¶ 41, 58 A.3d 1032 (quotation marks omitted). That responsibility carries an obligation "to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." M.R. Prof. Conduct 3.8 cmt. (1). This does not prohibit a prosecutor from assertively pursuing a case that should be prosecuted, but it prohibits the prosecutor from engaging in conduct that, in fact or appearance, constitutes "overreaching" or invites the fact-finder to "convict[] a person on the basis of something other than evidence presented during trial." *Dolloff*, 2012 ME 130, ¶ 40, 58 A.3d 1032. Instances of prosecutorial misconduct have "a debilitating effect on the entire judicial process." *State v. McDonald*, 472 A.2d 424, 426 (Me. 1984); *see also State v. Fahnley*, 2015 ME 82, ¶ 34, 119 A.3d 727 (discussing improper statements made by a prosecutor); *Dolloff*, 2012 ME 130, ¶ 42,

12

58 A.3d 1032 (elaborating on types of statements classified as prosecutorial misconduct).

[¶24]  "We review the denial of a motion for a new trial for clear error or an abuse of discretion . . . ."  *State v. Carey*, 2013 ME 83, ¶ 26, 77 A.3d 471 (quotation marks omitted).  Several of Robinson's particular assertions of prosecutorial misconduct are unpreserved because he did not object to the challenged statements.  The remaining arguments are based on preserved assertions of error.  Because of the differing standards of review, we examine those two categories of arguments separately, and then consider the cumulative effect of any proven misconduct.[5]

1.    Prosecutor's Comments During Opening Statement and Closing Argument

[¶25]  Robinson argues that the prosecutor made improper comments during the State's opening statement by emphasizing his experience prosecuting homicide cases, and during the State's closing argument by belittling the defense function when he facetiously told the jurors that in thirteen years of prosecuting murder cases, he is "always wrong . . . [and] never get[s] the right person."  Robinson did

---

[5]  In addition to the claims of misconduct addressed in the text, Robinson also argues on appeal that the prosecutor improperly disclosed sealed information about a wiretap when he met with Robinson's sister prior to trial.  When the issue arose during the trial, however, Robinson expressly told the court that he was not alleging any misconduct but attributed the issue to a "misunderstanding."  There is no merit to Robinson's contrary claim here, and we do not consider it further.

not object to those statements, and consequently we review these claims for obvious error. *Fahnley*, 2015 ME 82, ¶ 35, 119 A.3d 727; *Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032.

[¶26] The focus of the obvious error analysis, as with any claim of error in a legal proceeding, is on action or inaction by the court. In *Fahnley*, we held that

> [i]f a defendant demonstrates on appeal that there was prosecutorial misconduct that went unaddressed by the court, we will consider whether the error is plain—that is, whether the error is so clear under existing law that the court and the prosecutor were required to address the matter even in the absence of a timely objection.

2015 ME 82, ¶ 35, 119 A.3d 727. To prevail on appeal when the challenge is unpreserved, a defendant must also show a reasonable probability that the plain error affected his substantial rights—that is, that "the error was sufficiently prejudicial to have affected the outcome of the proceeding." *Dolloff*, 2012 ME 130, ¶ 37, 58 A.3d 1032 (quotation marks omitted). A prosecutor's statements that do not "draw an objection . . . will rarely be found to have created a reasonable probability that [they] affected the outcome of the proceeding." *Id.* ¶ 38. In those instances, the defendant shoulders a "significant" burden to establish that he is entitled to relief on appeal. *Id.*

[¶27] The cumulative effect of the prosecutor's statements to the jury was to improperly convey information about other murder cases he had prosecuted during his thirteen-year tenure with the Attorney General's office, and to suggest that the

14

same defense presented here, which centered on the identity of Fesmire's killer, has been rejected in those other cases. At the hearing on the motion for a new trial, the prosecutor testified that he made the comments about getting the "wrong" person with the hope that the jury would infer that the State got "the right person now and in the past." This testimony confirms that the prosecutor's argument was an appeal to the jury to base its decision on extraneous information—in other words, that because the State overcame alternative suspect challenges and obtained murder convictions in the past, it also correctly identified Robinson as Fesmire's murderer. It is, in the end, a call for the jury to base a guilty verdict on a factor that has no bearing on this case.

[¶28]  It is well established that "a prosecutor may use wit, satire, invective and imaginative illustration in arguing the State's case and may present an analysis of the evidence in summation with vigor and zeal." *Id*. ¶ 41 (quotation marks omitted). The State's presentation to the jury, however, must be "strictly confined to the domain of facts in evidence," *State v. Reilly*, 446 A.2d 1125, 1128 (Me. 1982); *see also State v. Hoffstadt*, 652 A.2d 93, 96 (Me. 1995), and the prosecutor "is not at liberty to disparage the legal principles upon which the defense is based," *McDonald*, 472 A.2d at 426. A prosecutor's argument is improper if it is "designed to awaken in the jury a suspicion that the defenses [are]

merely a subterfuge employed by the defendant to evade responsibility for his acts." *Id.*

[¶29] The prosecutor's argument to the jury violated these prohibitions. It consisted of an effort by the prosecutor to present himself as the voice of experience and to then assure the jury that the same defense raised here has been fruitless in other cases and therefore also should be fruitless in this case. Such an appeal to the jurors consists of an improper call for them to predicate a verdict based on information that goes beyond the evidence presented to them, *see Reilly*, 446 A.2d at 1129, and it tended to improperly diminish the stature of Robinson's alternative suspect defense seeking to raise a reasonable doubt about the allegation that he was the perpetrator, *see McDonald*, 472 A.2d at 425-26.

[¶30] Given the strength of the State's case against Robinson, however, he is unable to demonstrate that there exists a reasonable probability that this unpreserved prosecutorial misconduct "affected the outcome of the proceeding." *Dolloff*, 2012 ME 130, ¶ 37, 58 A.3d 1032 (quotation marks omitted). Over the course of a ten-day trial, the State presented evidence of incriminating statements that Robinson made to several people, including his sister, a friend who was a member of the Maine National Guard, and a detective; evidence that Robinson had threatened to kill Fesmire; evidence that on the morning Fesmire was last seen, Robinson was at the apartment near where Fesmire had last been seen and that a

16

bucket of bloody water was found there; and forensic evidence that blood in the apartment and in the trunk of the Lexus used by Robinson was Fesmire's.

[¶31]  Additionally, in its charge, the court instructed the jurors to subordinate the attorneys' statements and arguments to their own recollections of the evidence and their views of the case.  The court presumably did not give this instruction to the jury as a direct response to the State's improper argument to the jury, because Robinson did not object to that argument.  Nonetheless, the court's cautionary instruction would have had the prophylactic effect of minimizing the impact of improprieties in the arguments of either party.  *Cf. Fahnley*, 2015 ME 82, ¶ 33, 119 A.3d 727 ("Any concern created by improper statements made by a prosecutor is likely to be cured by a prompt and appropriate curative instruction, especially when such an instruction is specifically addressed to the prosecutor's misconduct." (quotation marks omitted)); *State v. Clark*, 2008 ME 136, ¶ 14, 954 A.2d 1066 (noting that the trial court can cure improprieties in a prosecutor's closing argument with instructions that the arguments of counsel are not evidence).

[¶32]  Therefore, as we view the record of the trial proceedings as a whole, we conclude that Robinson has not established that the State's improper argument affected the outcome of the case, and he therefore has not shown that this is one of

the "rare[]" cases, *see Dolloff*, 2012 ME 130, ¶ 38, 58 A.3d 1032, where a prosecutor's improper statements generate obvious error.

2.      Prosecutor's Conduct During Robinson's Closing Argument

[¶33]   The second aspect of Robinson's prosecutorial misconduct claim is based on allegations that during Robinson's closing argument, the prosecutor gestured toward him while mouthing words to the jury, and at other times pretended to be asleep.

[¶34]   Robinson raised these issues for the first time in his motion for a new trial.   Although Robinson did not make a contemporaneous objection to the prosecutor's actions, those actions allegedly occurred when defense counsel was unable to see the prosecutor because he was presenting his closing argument. Therefore, at oral argument, the State recognized that this challenge should be analyzed under the clear error standard that accompanies arguments preserved for appeal.   Where a claim of prosecutorial misconduct is preserved, the burden rests on the State to establish that "it is highly probable that the jury's determination of guilt was unaffected by" that misconduct.  *Id.* ¶ 34 (quotation marks omitted).  This requires consideration of the totality of the circumstances, including the severity of the misconduct; the motivation behind the misconduct, including whether it was intentional or inadvertent; the strength of the State's evidence; and the jury instructions, including any curative instructions.  *Id.* ¶ 33.

18

[¶35]  On Robinson's motion for a new trial, the court held a hearing where testimony was presented by several people who were in the courtroom during all or portions of the parties' closing arguments.  The witnesses included the prosecutor; Robinson's trial counsel; two detectives; and a local attorney, Jason Dionne.[6] Based on that evidence, the court issued an initial order denying Robinson's motion and, after Robinson moved for the court to issue further findings of fact and conclusions of law, *see* M.R. Crim. P. 23, a second order reiterating the denial.

[¶36]  In those orders, the court found that during Robinson's closing argument, the prosecutor did not make any remarkable gestures as Robinson had alleged.  With respect to Robinson's allegation that the prosecutor pretended to sleep during the defense's closing argument, the court found that "the [p]rosecutor testified that he probably did" engage in conduct that portrayed sleeping, and that he has done so "because it can annoy defense counsel."  This does not constitute an affirmative finding by the court that the prosecutor feigned sleep, but rather is closer to a reiteration of the testimony.  However, we treat the court's acceptance of the prosecutor's admission as an implied finding that Robinson's allegation on this point is correct.

---

[6]  Another witness, also a local attorney, testified, but the court rejected his testimony as unreliable.

[¶37]  The court also addressed the most serious of Robinson's charges, which was the allegation that during his summation, the prosecutor answered rhetorical questions that Robinson presented to the jury.  Robinson framed his argument to the jury in part by posing questions about who would have had inside information about Fesmire's activities, implying that a person other than Robinson had that information and therefore was the killer.  Based largely on Dionne's testimony, Robinson alleged that when he asked such a question during his summation, the prosecutor pointed at Robinson and mouthed the words, "He did." Dionne testified that several of the jurors appeared to notice the prosecutor's conduct.  The prosecutor denied that he did this, and two detectives, one seated next to the prosecutor and one seated in the rear of the courtroom, testified that they did not witness any such conduct.

[¶38]  The court's findings on this factual question are less than clear.  It found that Dionne's testimony and the contradictory testimony from others were credible and "equally forthright."  The court also found that "there was no prosecutorial misconduct during [Robinson's] closing argument," which implies a finding that the prosecutor did not engage in the alleged conduct.  The court, however, expressly reserved any specific findings on that issue, repeatedly referring to the conduct as hypothetical: "if it did occur."  Nonetheless, the court did made clear its ultimate conclusions that "it is highly probable that the jury's

20

determination was unaffected by the [p]rosecutor's conduct," and "that the interests of justice were protected throughout the trial and that the [d]efendant received a fair and just trial by jury." The court grounded that conclusion on the length of the trial where the jury "listened to days of proper direct and cross-examination by both attorneys;" the otherwise "exemplary" conduct of both attorneys throughout the trial;[7] and the court's general instructions to the jurors, described above, that the statements of counsel are not evidence and that the jurors' memory of the evidence and views of the case control.

[¶39]  On reviewing the denial of a motion for a new trial, "[w]e defer to the trial court's determination of weight and credibility and review the trial court's denial . . . for clear error." *See State v. Doyon*, 1999 ME 185, ¶ 10, 745 A.2d 365. We consider in turn Robinson's claim as it relates to allegations of improper gestures, feigned sleep, and surreptitious responses to Robinson's summation.

[¶40]  First, the court did not err in finding that during Robinson's closing argument, the prosecutor did not make unusual or disruptive gestures as Robinson alleged because the court supported that finding with an express credibility determination that the testimony describing this conduct was not reliable.

---

[7]  In its order, the court noted that it did not observe the prosecutor engage in any improper conduct and in fact commended counsel in the jury's presence for their professional conduct and courteous interaction with each other.

[¶41]  Second, although it appears that the court credited evidence that the prosecutor pretended to be asleep during Robinson's summation, it did not err in concluding that, to a high probability, it did not affect the jury's verdict.  Without question, that conduct was sophomoric, unprofessional, and a poor reflection on the prosecutor's office.  The question presented here, however, is whether the court erred in concluding that it did not affect Robinson's right to a fair trial.  That conclusion was not erroneous.

[¶42]  Finally, although the court did not make a clear finding of whether the prosecutor improperly communicated with the jury by mouthing answers to the questions that Robinson posed to the jury during his summation, the court expressly determined that that conduct—"if it occurred"—would not entitle Robinson to a new trial.  Particularly because the trial court was in a position to gauge the dynamics of the trial and the effect that any such misconduct would have had on the jury, we give deference to the court's assessment.  *Cf. State v. Poblete*, 2010 ME 37, ¶ 26, 993 A.2d 1104 (stating that the denial of a motion for a mistrial arising from the trial process is reviewed for an abuse of discretion because of the trial court's "superior vantage point").

[¶43]  In its written orders, the court articulated a reasoned and factually supported explanation for its conclusion that Robinson would not have been prejudiced if the prosecutor had acted as alleged.  By the time the jurors heard

Robinson's summation, it had also absorbed a considerable amount of evidence from twenty-eight witnesses and more than sixty exhibits presented over the course of ten days. The portion of the trial at issue here, in comparison, was limited and contained. Additionally, the jurors had already heard the State's summation. Based on that and more generally on the structure of a trial itself and the attorneys' roles in it, the jurors could not have been surprised that the prosecutor would want to answer Robinson's questions in a way that was favorable to the prosecution. Further, as the court noted, it instructed the jurors that their memories of the evidence and their assessments of the case were more important than the statements of counsel. This admonition served to assure that the jurors understood that they were the decision-makers and helped to remind them that the attorneys were partisan.

[¶44] The prosecutor's conduct—"if it occurred"—was wrongful. We conclude, however, that whatever other sanction may have been warranted if the court observed any such misconduct, the court did not err in denying Robinson's motion for a new trial based on its express finding, to a high probability, that the

verdict was not affected by the prosecutor's conduct. *See Dolloff*, 2012 ME 130, ¶ 34, 58 A.3d 1032.[8]

### 3. Cumulative Effect of Misconduct

[¶45] Here, because Robinson has alleged several instances of prosecutorial misconduct, we review these allegations "cumulatively and in context to determine whether [Robinson] received an unfair trial that deprived [him] of due process." *Id.* ¶ 74. The lengthy trial was free of appellate challenges to the constitution of the jury or to the evidence, the jury was properly instructed, and the evidence was plainly sufficient to support the verdict. Examining the totality of the proceedings, we cannot conclude that the aggregate impact of misconduct affected the jury's verdict or otherwise compromised Robinson's right to a fair trial.

### B. Jury Request for Read-Back

[¶46] Robinson's final contention on appeal is that the court's response to the jury's request for a read-back of the testimony of the woman who worked for Robinson's sister was prejudicially insufficient. Here, because Robinson did not object to the court's responses to the jury, we review the claim for obvious error,

---

[8] An additional factor that is germane to the question of whether a defendant becomes entitled to a new trial in the face of prosecutorial misconduct is the strength of the prosecution's evidence. *State v. Dolloff*, 2012 ME 130, ¶ 33, 58 A.3d 1032. Although the court did not expressly refer to this consideration in its post-trial orders, it provides further support for the court's denial of Robinson's motion for a new trial.

where Robinson must demonstrate that there was error that affected the outcome of the trial. *Id*. ¶¶ 35, 37.

[¶47] During its deliberations, the jury requested that the court provide it with the transcript of the testimony of the woman who worked for Robinson's sister that had been read into the record during the trial. The transcript contains more than ninety pages of testimony. The court responded by asking the jury in writing which portions of the transcript they wanted to review, and the jury responded, "All of it." In a responsive second note, the court properly declined to provide the written transcript itself because the transcript was not offered or admitted as a jury exhibit. Instead, in its note, the court advised the jurors that it had "no problem" allowing them to hear the transcribed testimony read to them again in open court. Presumably because of the length of the transcribed testimony, the court again asked the jurors if they wanted to narrow their request so that only portions of interest to them would be included in a read-back. The court never denied the jury's request. The jury, however, did not respond to the court's inquiry and instead returned with a verdict about an hour later.

[¶48] Because the court did not actually or constructively refuse to allow a read-back, this case does not require us to consider whether the court abused its discretion to the point of obvious error by denying all or part of the jury's request. *See* 14 M.R.S. § 1106 (2015) ("When a jury, not having agreed, returns into court

stating the fact, the presiding justice may, in the exercise of judicial discretion . . . restate any particular testimony and send them out again for further consideration."); *State v. Reynolds*, 604 A.2d 911, 912 (Me. 1992) (applying section 1106 in a criminal case and noting that the court's decision whether to allow a read-back requested by a jury is reviewed for an abuse of discretion); *State v. Engstrom*, 453 A.2d 1170, 1172-73 (Me. 1982). Rather, in its communications with the jurors, the court merely made a reasonable effort to clarify the nature of their request. A court's request that a jury narrow a broad read-back request is not an abuse of discretion. *State v. Giglio*, 441 A.2d 303, 309-10 (Me. 1982). Here, although the jury initially indicated that it wanted to review all of the testimony of the woman who worked for Robinson's sister, the court explained that the procedure would involve a read-back in the courtroom, rather than simply providing a copy of the transcript to the jury in the jury room. With that additional information, the court acted well within its discretion by inquiring again if the jurors still wanted to hear all of the testimony encompassed by the original request.

## IV. CONCLUSION

[¶49] We conclude that the instances of prosecutorial misconduct did not deprive Robinson of a fair trial and that the court committed no error in its responses to the jury's request for a review of testimony.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Adam P. Sherman, Esq., Paradie, Sherman, Walker & Worden, P.A., Lewiston, for appellant Buddy Robinson

Janet T. Mills, Attorney General, and Donald W. Macomber, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Adam P. Sherman, Esq., for appellant Buddy Robinson

Donald W. Macomber, Asst. Atty. Gen., for appellee State of Maine