MAINE SUPREME JUDICIAL COURT          Reporter of Decisions
Decision:    2016 ME 126
Docket:      Ken-15-519
Argued:     June 8, 2016
Decided:    August 11, 2016

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

## STATE OF MAINE

v.

## FRANKLIN F. ARBOUR JR.

HUMPHREY, J.

[¶1]   Franklin Arbour Jr. appeals from a judgment of conviction for multiple drug offenses entered by the Superior Court (Kennebec County, *E. Walker, J.*) following a jury trial.  He contends that (1) the court erred by denying his motion to suppress evidence seized pursuant to a search warrant; (2) the court erred by denying his motion to suppress a statement he made to a police officer before receiving *Miranda* warnings; and (3) the evidence of drug quantity at trial was insufficient to support his conviction for aggravated trafficking of heroin.[1]  We affirm the judgment.

---

[1] We are unpersuaded by, and do not discuss further, Arbour's claims that the evidence at trial was otherwise insufficient to support his convictions, that the court erroneously instructed the jury, and that he is entitled to a new trial due to prosecutorial misconduct.

## I. BACKGROUND

### A.    Search Warrant

[¶2]  On September 17, 2014, Augusta police sought a search warrant to conduct a search at an apartment located at 58 River Street in Augusta.  In the affidavit accompanying the request for a search warrant, Detective Eric Dos Santos offered the following facts.  He had recently arrested John Howard on outstanding warrants and for a probation violation.  While Howard was detained at the county jail on a probation violation hold, he agreed to provide information regarding stolen tools found in his vehicle and other criminal activity; the detective arranged to have the probation hold lifted and Howard released.  Howard told the detective that he had sold stolen tools for Arbour; that Arbour sold stolen merchandise out of his residence on the top floor of 58 River Street; that Howard had made multiple trips for Arbour from the apartment to sell or pawn stolen tools in Maine, New Hampshire, and Massachusetts; and that he would receive gas money and heroin from Arbour in exchange for selling the tools for him.  Howard also told the detective that he would buy heroin from Arbour for his own use, and that Arbour usually had "a couple of bundles" of heroin—meaning at least twenty bags of heroin— in his apartment at any given time.  Howard also described an air compressor

that he had seen at Arbour's apartment on his most recent visit, which Detective Dos Santos noted matched the description of a compressor that was recently reported stolen in Augusta. Finally, Howard provided a hand-drawn map of Arbour's apartment and indicated that not only were there stolen tools in the apartment, but there was also a marijuana grow operation in the adjoining attic. The detective confirmed through a police database that Howard had sold tools to pawn shops in Maine, New Hampshire, and Massachusetts. The court (Augusta, *E. Walker, J.*) issued a search warrant authorizing, inter alia, a search of the apartment and the seizure of heroin, marijuana, other scheduled drugs, and tools.[2]

B.     Execution of the Search Warrant and Arbour's Arrest

[¶3]   Viewed in the light most favorable to the jury's verdict, the evidence at trial establishes the following facts. *State v. Robinson*, 2016 ME 24, ¶ 2, 134 A.3d 828. On September 17, 2014, officers with the Augusta Police Department and the Maine Drug Enforcement Agency executed the search warrant at the top floor apartment at 58 River Street, which was known by police to be the residence of Arbour and his girlfriend, Angie Sousa. When law enforcement arrived to execute the warrant, Sousa was the only person

---

[2] The attic was not specifically described in the warrant, but this issue was not raised before the suppression court or on appeal.

present in the apartment. At some point, Arbour showed up at the apartment without being contacted by law enforcement[3] and spoke with Detective Jason Cote, who was in the apartment's entry area. Arbour told Cote to "go ahead and arrest me now" and stated that his girlfriend, Sousa, "had nothing to do with it."[4] Cote placed Arbour under arrest and notified Dos Santos, who was searching the attic at the time. Both detectives transported Arbour to the Augusta Police Department. At the police department and before receiving *Miranda* warnings, Arbour made an incriminating statement, which was recorded by an interview room camera.

[¶4] During the search, the police found 114 marijuana plants and approximately twenty-five pounds of processed marijuana in the apartment and the adjoining attic. In the only room being used as a bedroom, the police found several items that would likely be used by a man, as well as a debit card in Arbour's name, in the nightstand on the left-hand side of the bed. In the same area, the police also found a thermos, which contained, relevant to this

---

[3] Evidence presented at the hearing on Arbour's motion to suppress a statement he later made at the police department established that the police allowed Sousa to leave the apartment before Arbour showed up. Sousa was later arrested and charged with a drug offense.

[4] At the hearing on Arbour's motion to suppress his later statement, Cote testified that, without prompting, Arbour told him to "go ahead and arrest me now" and stated, "[my] girlfriend had nothing to do with *this*."

appeal, 1,252 packets of what the police believed to be heroin and a sandwich bag containing what appeared to be cocaine base.[5]

C.    Charges

[¶5]   On November 14, 2014, a grand jury returned an eight-count indictment charging Arbour with the following:

- Aggravated trafficking of scheduled drugs (heroin) (Class A), 17-A M.R.S. § 1105-A(1)(H) (2015);
- Aggravated trafficking of scheduled drugs (heroin) with a prior conviction (Class A), 17-A M.R.S. § 1105-A(1)(B)(1) (2015);
- Aggravated trafficking of scheduled drugs (cocaine/cocaine base) with a prior conviction (Class A), 17-A M.R.S. § 1105-A(1)(B)(1);
- Unlawful trafficking in scheduled drugs (cocaine/cocaine base) (Class B), 17-A M.R.S. § 1103(1-A)(A) (2015);
- Unlawful trafficking in scheduled drugs (marijuana) (Class C), 17-A M.R.S. § 1103(1-A)(F) (2015);
- Aggravated cultivating of marijuana (Class B), 17-A M.R.S. § 1105-D(1)(A)(2) (2015);
- Unlawful possession of scheduled drugs (cocaine base) (Class B), 17-A M.R.S. § 1107-A(1)(A)(2) (2014);[6] and
- Unlawful possession of scheduled drugs (heroin) (Class C), 17-A M.R.S. § 1107-A(1)(B)(1) (2014).

Arbour pleaded not guilty to all charges at his arraignment on November 25, 2014.

---

[5]  The thermos also contained approximately 11.7 grams of bk-MDEA ("bath salts"), and the police found stolen tools throughout the apartment.

[6]  Subsections 1107-A(1)(A) and (B) have since been amended.  *See* P.L. 2015, ch. 308, §§ 1, 2; P.L. 2015, ch. 346, § 6 (effective Oct. 15, 2015).

6

D.    Motion to Suppress Evidence Seized from Apartment

[¶6]  Arbour moved to suppress all evidence seized from the apartment, and he later filed a supplemental motion for a *Franks* hearing pertaining to the search warrant affidavit.  *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). A hearing was held on May 26, 2015, and the court (Kennebec County, *Murphy, J.*) denied both motions.[7]  In its ruling, the court found that there was a substantial basis for the finding of probable cause supporting the warrant because (1) the information provided by Howard as related in the affidavit was very specific; (2) Howard demonstrated a base of knowledge from his criminal exploits with Arbour; (3) Howard's credibility was supported by his statements against penal interest regarding his use and possession of heroin; and (4) his credibility was further bolstered by the corroborating information regarding his selling of tools and his description of an air compressor in the apartment.

---

[7]  The court denied the motion for a *Franks* hearing because it found that the search warrant was supported by probable cause even without considering the statement in the affidavit that would have been the subject of the *Franks* hearing.  *See State v. Torrey*, 1998 ME 5, ¶ 4, 704 A.2d 397. Arbour does not challenge this aspect of the court's decision on this appeal.

E.      Motion to Suppress Statement at Police Department

[¶7]    Arbour also moved to suppress a statement he made in the interview room at the police department before receiving *Miranda* warnings. On July 23, 2015, the court held a testimonial hearing on the motion. Detectives Cote and Dos Santos testified, and the court watched the interview room video.  In an order dated July 24, 2015, the court (Augusta, *Fowle, J.*) denied Arbour's motion.

[¶8]  The court found the following facts, which are supported by record evidence.  *See State v. Lovett*, 2015 ME 7, ¶ 3, 109 A.3d 1135.  At some point between the time when Arbour was arrested at the apartment and when he made the statement in question at the police department, Dos Santos was informed that Arbour had asked to be arrested upon his arrival at the apartment.  After Arbour was taken to the police department, he was put in an interview room.  He was alone in the room for approximately two minutes, handcuffed behind his back.  Detective Dos Santos entered the room and spent less than two minutes "describing what had occurred that day," including that Sousa, Arbour's girlfriend, had been arrested and charged with drug offenses.

8

Arbour then stated, "She had nothing to do with it. It's all me."[8] At that point, the detective instructed Arbour to not make any further statements, finished explaining what had occurred that day, and then provided him with the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966). After Arbour invoked his right to remain silent, the detective terminated the interaction.

[¶9] Based on its findings, the court concluded that Arbour was not subjected to custodial interrogation at the time he made his incriminating statement because "the actions of Detective Dos Santos in providing [Arbour] with a summary of the evidence against him, and information as to the status of Ms. Sousa, [does not] constitut[e] a statement reasonably likely to elicit an incriminating response, nor was such a statement calculated to do so."

F.  Trial

[¶10] A two-day trial commenced on August 24, 2015. The jury viewed the relevant portion of the interview room video. Arbour presented evidence to suggest that he and Sousa were merely housesitting at the apartment for an incarcerated friend, that multiple people had access to the apartment, and that he was not responsible for the drugs. He moved for a judgment of acquittal

---

[8] Although the court found that Arbour had stated, "She had nothing to do with *it*," or "She had nothing to do with *this*," the video appears to show that Arbour actually said, "She had nothing to do with *any of it*." For accuracy, we use the latter version in the remainder of this opinion.

based on insufficiency of the evidence at the close of the State's case-in-chief and again at the close of trial. The court (Kennebec County, *E. Walker, J.*) denied both motions. Six counts went to the jury,[9] and the jury returned verdicts of guilty on all counts. Arbour moved for a judgment of acquittal or a new trial, and the court denied the motion after a hearing on October 14, 2015. The court sentenced Arbour to twenty-five years in jail on Count 1, with all but eighteen years suspended, and four years' probation, with concurrent sentences on all other charges. Arbour timely appealed to us from both the conviction and his sentence.[10]

## II. DISCUSSION

### A.   Motion to Suppress Evidence Seized from Apartment

[¶11]  Arbour first contends that the court erred by denying his motion to suppress evidence because the affidavit in support of the search warrant did not establish probable cause. Specifically, he argues that the affidavit "fail[ed] to set forth sufficient information establishing [Howard]'s veracity or reliability."

---

[9]  Arbour stipulated to the prior conviction alleged in Counts 2 and 3 of the indictment. The court, with agreement of the parties, consolidated Counts 1 and 2 of the indictment into a single count and Counts 3 and 4 into a second count to submit to the jury.

[10]  The Sentence Review Panel denied Arbour's request for leave to appeal his sentence on December 17, 2015.

[¶12]  We "review directly the finding of probable cause made by the [judge] who issued the warrant, affording great deference to the issuing [judge]," *State v. Wright*, 2006 ME 13, ¶ 8, 890 A.2d 703, and we "draw all reasonable inferences from the affidavit to support the finding of probable cause . . . limit[ing] our inquiry to whether there is a substantial basis for the finding of probable cause under the totality of the circumstances test," *State v. Estabrook*, 2007 ME 130, ¶ 5, 932 A.2d 549.  Pursuant to that test, "[p]robable cause is established when, given all the circumstances set forth in the affidavit before [the judge], including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *State v. Rabon*, 2007 ME 113, ¶ 22, 930 A.2d 268 (quotation marks omitted).  "When a warrant affidavit reports information provided by an informant . . . the totality-of-the-circumstances approach permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending [the] informant's tip."  *Id.* ¶ 23 (quotation marks omitted).

[¶13]  An informant's assertions, on their own, may establish probable cause if the affidavit demonstrates the informant's reliability or basis of knowledge, such as firsthand observation of contraband or illegal activity.  *See*

*id.* ¶ 24; *see also United States v. Taylor*, 985 F.2d 3, 6 (1st Cir. 1993) ("[T]he affidavit may disclose an adequate basis for evaluating the informant's veracity through the very specificity and detail with which it relates the informant's *first-hand* description of the place to be searched or the items to be seized."). In addition, an informant's credibility is bolstered if the affidavit contains statements against his or her penal interest, even if the informant is from the "criminal milieu." *See Rabon*, 2007 ME 113, ¶ 28, 930 A.2d 268 (quotation marks omitted); *see also State v. Appleton*, 297 A.2d 363, 369 (Me. 1972). Even without sufficient information about the informant, an informant's assertions can still support probable cause if the affidavit contains "something more," such as corroboration by outside sources. *Rabon*, 2007 ME 113, ¶¶ 29-30, 930 A.2d 268 (quotation marks omitted).

[¶14] In this case, the affidavit (1) provided detailed information about the named informant, Howard, and explained how he had come to directly observe contraband in the apartment; and (2) noted that Howard had provided highly specific information, including a hand-drawn map of the apartment. The affidavit also contained statements by Howard against his penal interest. Furthermore, the police corroborated Howard's assertions that he had pawned or sold tools as he described and that he had observed a

possibly stolen air compressor in the apartment. In these ways, this case differs from *Rabon*, in which we concluded that the affidavit provided insufficient information about the informant and that the police had only corroborated "readily available information" that did not "show that the tipster has knowledge of concealed criminal activity," 2007 ME 113, ¶ 34, 930 A.2d 268 (quotation marks omitted); unlike the informant in *Rabon*, Howard provided "inside information" about criminal activity and contraband in the apartment. *See id.* (quotation marks omitted).

[¶15] The fact that the affidavit contains information that Howard's criminal history involves convictions for crimes of dishonesty, and that the police arranged for Howard to be released from incarceration on a probation hold before he provided them with information, may be considered when conducting the "balanced assessment" of the factors supporting or undercutting the informant's tip. *See id.* ¶ 23 (quotation marks omitted). However, given the information in the affidavit unrelated to Howard,[11] and the deference that must be shown to the judge who issued the warrant, *see*

---

[11] In addition to recounting the information provided by Howard, the affidavit stated that Dos Santos had looked up Arbour's criminal record and found that he had previously been convicted of drug crimes and dealing in stolen property, among other offenses. "An affiant's knowledge of the target's prior criminal activity or record clearly is material to the probable cause determination." *United States v. Taylor*, 985 F.2d 3, 6 (1st Cir. 1993); *see also State v. Gallant*, 531 A.2d 1282, 1284 (Me. 1987) (considering a target's prior conviction for drug trafficking in assessing whether there was probable cause for a search warrant).

*Wright*, 2006 ME 13, ¶ 8, 890 A.2d 703, Howard's criminal history and the benefit he received from the police do not negate probable cause.

[¶16] We conclude that there was a substantial basis for the finding of probable cause to issue the search warrant and that the suppression court did not err by denying Arbour's motion to suppress the evidence seized from the apartment.[12]

B.      Motion to Suppress Statement at Police Department

[¶17] Arbour next contends that the court erred by denying his motion to suppress his statement that Sousa "had nothing to do with any of it, it's all me," which he made to Dos Santos at the Augusta Police Department before receiving *Miranda* warnings. He argues in part that he was subjected to interrogation at the time he made the statement because the detective knew that, by providing Arbour with information about the evidence against him and the charges against Sousa, he was likely to elicit an incriminating response based on the fact that Arbour had already made an incriminating statement at the apartment.[13]

---

[12] Because we conclude that there was a substantial basis for the finding of probable cause to issue the search warrant, we do not consider the State's alternative "good faith" argument.

[13] Arbour does not directly argue that the detective was trying to play upon Arbour's personal relationship with Sousa. Arbour's contention that the "highly custodial environment" of the interview room should factor into our analysis in this case is not supported. *See Rhode Island v.*

[¶18]  We review the court's factual findings for clear error and "the ultimate determination of whether the statement should be suppressed" de novo.  *State v. Bragg*, 2012 ME 102, ¶ 8, 48 A.3d 769 (quotation marks omitted).  The State concedes that Arbour was in custody at the time he made the statement, and the basic facts are not in dispute.  Therefore, we must only consider whether the court erred by concluding that Arbour was not subject to interrogation at the time he made the statement at issue.

[¶19]  "A person subject to interrogation while in police custody must first be given a *Miranda* warning, otherwise statements made in the course of the interrogation will not be admissible against that person."  *State v. Holloway*, 2000 ME 172, ¶ 13, 760 A.2d 223.  Interrogation, in this context, "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).[14]  "The test for determining whether a police officer's statement is

---

*Innis*, 446 U.S. 291, 300 (1980) ("'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.").

[14]  Although Dos Santos testified at the suppression hearing that it is his practice to inform an arrestee of the charges and evidence against him or her, his statements to Arbour likely were not communications "normally attendant to arrest and custody," which always fall outside the definition of "interrogation" for purposes of *Miranda, Innis*, 446 U.S. at 301, such as "[b]rief, routine

the functional equivalent of interrogation reasonably likely to elicit an incriminating response is an objective one." *State v. Smith*, 612 A.2d 231, 233 (Me. 1992). "Officers do not interrogate a suspect simply by hoping that he will incriminate himself," and ordinarily, there is no interrogation in the absence of direct questioning unless the defendant is subjected to "compelling influences [or] psychological ploys." *Arizona v. Mauro*, 481 U.S. 520, 529 (1987). The overriding consideration "[i]n deciding whether particular police conduct is interrogation [is] preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Id.* at 529-30.

[¶20] We have specifically recognized that the "*Innis* definition of interrogation is not so broad as to capture within *Miranda*'s reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges." *Bragg*, 2012 ME 102, ¶ 16, 48 A.3d 769 (quotation marks omitted). In *Bragg*, after taking an intoxilyzer test and being informed that her results were over the legal limit, the defendant "responded [to the police officer] that she had thought when she ordered the second margarita at dinner it was probably a bad idea."

---

questions posed to a suspect during 'booking' procedures," *State v. Estes*, 418 A.2d 1108, 1111 (Me. 1980) (alteration in original) (quotation marks omitted).

*Id.* ¶ 6. We concluded that the officer had merely provided "a matter-of-fact communication of the evidence" and that this communication was not the functional equivalent of interrogation. *Id.* ¶ 16 (quotation marks omitted). Although we suggested that our conclusion was based to some extent on the fact that the defendant was entitled to the intoxilyzer test information under state law, we also cited with approval other cases reaching broader conclusions. *Id.*

[¶21] For example, we cited *Caputo v. Nelson*, 455 F.3d 45, 50-51 (1st Cir. 2006), in which the United States Court of Appeals for the First Circuit determined that a police officer had not engaged in the functional equivalent of interrogation by using the defendant's phone in his presence "to relay information about what the officers found at [the defendant]'s residence" to other officers. *Bragg*, 2012 ME 102, ¶ 16, 48 A.3d 769. In discussing the limits of *Innis*'s conception of "interrogation," the *Caputo* court approvingly cited *Plazinich v. Lynaugh*, 843 F.2d 836, 837, 839 (5th Cir. 1988), in which the Fifth Circuit concluded that an officer did not interrogate a defendant by informing him that his co-defendant had attempted suicide. *Caputo*, 455 F.3d at 51. In *Bragg*, we also cited *Easley v. Frey*, 433 F.3d 969, 971, 974 (7th Cir. 2006), in which the Seventh Circuit held that an investigator had not

"interrogated" a defendant when he told the defendant about evidence implicating him in a prison murder and informed him that he could be subject to the death penalty if convicted. *Bragg*, 2012 ME 102, ¶ 16, 48 A.3d 769. The *Easley* court noted that there was no evidence that the investigator's statements were "anything more than a matter-of-fact communication of the evidence against [the defendant] and the potential punishment he faced" and stated, "[W]e do not believe that the provision of information, even if its weight might move a suspect to speak, amounts to an impermissible 'psychological ploy.'" *Easley,* 433 F.3d at 974 (quotation marks omitted).

[¶22]   Taken together, our opinion in *Bragg* and the cases we cited approvingly stand for the proposition that informing a person of the evidence against him, and of a co-defendant's status, does not constitute interrogation in the absence of evidence that the person was subjected to "compelling influences," or that the communication was a "psychological ploy," *see Mauro*, 481 U.S. at 529, to elicit an incriminating response. *See Innis*, 446 U.S. at 299 (describing "psychological ploys" as including positing the subject's guilt, minimizing the moral seriousness of the crime, and casting blame on the victim or others). In this case, there is no evidence of compelling influences or that the detective was engaging in a "psychological ploy" to elicit an

18

incriminating statement from Arbour. Rather, the evidence supports the court's findings that the detective could recall knowing only that Arbour had previously asked to be arrested—not that he had previously made a statement deflecting responsibility from Sousa; that the detective provided Arbour only "with a brief summary as to what had occurred and what evidence had been seized"; that Arbour "was not invited to or encouraged to respond"; that the detective stopped Arbour from making any further statements; and that he "quickly ended any communication" with Arbour once he invoked his *Miranda* rights. We conclude that Arbour was not subject to interrogation at the time he made his statement and therefore that the court did not err by denying his motion to suppress.[15]

C.     Heroin Quantity

[¶23]  Finally, Arbour challenges the sufficiency of the evidence of drug quantity supporting his conviction for aggravated trafficking of heroin. Because Arbour stipulated to a prior drug conviction, the State had to prove beyond a reasonable doubt that he intentionally or knowingly possessed

---

[15]  We note that "[a]ny knowledge the police may have had concerning the *unusual susceptibility* of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 302 n.8 (emphasis added). However, it would be difficult to conclude that the detective was aware of any "unusual susceptibility" of Arbour to incriminate himself merely based on the knowledge that Arbour had asked to be arrested at the apartment.

"6 grams or more or 270 or more individual bags, folds, packages, envelopes or containers of any kind containing heroin." 17-A M.R.S. § 1105-A(1)(H), (1)(B)(1); *see also* 17-A M.R.S. § 1103(1-A) (2015) (providing that "a person is guilty of unlawful trafficking in a scheduled drug if the person intentionally or knowingly trafficks in what the person knows or believes to be a scheduled drug, which is in fact a scheduled drug"); 17-A M.R.S. § 1101(17)(E) (2015) (defining "traffick" to include "possess[ing] 2 grams or more of heroin or 90 or more individual bags, folds, packages, envelopes or containers of any kind containing heroin").

[¶24]  At trial, the State presented evidence that 1,252 packets seized from the apartment had the characteristics of heroin packaging and that a certified chemist confirmed that five randomly chosen packets contained heroin.  The chemist further testified he could make the "common sense inference" that the other packets also contained heroin, even if he could not make a "scientific inference" to that effect.  We conclude that this evidence was sufficient for the jury to find beyond a reasonable doubt that 270 or more of the packets seized from the apartment contained heroin.  *See State v. Barnard*, 2001 ME 80, ¶ 12, 772 A.2d 852 (holding that even "[i]n the absence of a chemical analysis, other direct and circumstantial evidence," including

20

testimony by an experienced drug agent as to the appearance of substances believed to be drugs, "can establish beyond a reasonable doubt the identity of drugs").

[¶25] Arbour's suggestion that our recent decision in *State v. Pinkham*, 2016 ME 59, 137 A.3d 203, affects his conviction is incorrect. In *Pinkham*, we vacated a heroin trafficking conviction where the defendant pleaded guilty to trafficking "2 grams or more of heroin" but the State did not present evidence sufficient to show that the defendant trafficked "pure" heroin in that amount. *Pinkham*, 2016 ME 59, ¶¶ 3, 8, 23, 137 A.3d 203. In this case, by contrast, Arbour was convicted of trafficking heroin in a quantity of "6 grams or more *or 270 or more individual bags, folds, packages, envelopes or containers of any kind containing heroin*." Because the State was not required to prove that the packets contained a certain amount of pure heroin, *Pinkham* does not apply. *See id.* ¶ 15.

D.    Conclusion

[¶26] For the foregoing reasons, we affirm the judgment.

The entry is:

Judgment affirmed.

**On the briefs:**

Luann L. Calcagni, Esq., Augusta, for appellant Franklin F. Arbour, Jr.

Janet T. Mills, Attorney General, and Katie Sibley, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Luann L. Calcagni, Esq., for appellant Franklin F. Arbour, Jr.

Katie Sibley, Asst. Atty. Gen., for appellee State of Maine

Kennebec County Superior Court docket number CR-2014-958
FOR CLERK REFERENCE ONLY