In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-2627

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERNEST CLARK,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 11-CR-30 — **J. Phil Gilbert**, *Judge.*

ARGUED JANUARY 7, 2014 — DECIDED JUNE 6, 2014

Before WOOD, *Chief Judge*, and POSNER and KANNE, *Circuit Judges*.

WOOD, *Chief Judge*. Ernest Clark's string of bank robberies in the Milwaukee area attracted the attention of both state and federal authorities. When both sovereigns decided to prosecute Clark around the same time, the occasionally delicate practices designed to coordinate the timing and pursuit of state and federal prosecutions came into play. Though Clark does not contest the facts underlying his federal con-

victions, he argues that violations of the Speedy Trial Act and the Interstate Agreement on Detainers require us to reverse his convictions. We conclude, however, that nothing was amiss, and affirm the judgment of the district court.

**I**

Clark committed six armed bank robberies in the greater Milwaukee area between October 2008 and August 2010. The details of these crimes are irrelevant to his appeal, but the timing of his apprehension and prosecution is important. On October 8, 2010, Milwaukee police officers who knew that Clark was wanted in connection with at least one of the robberies attempted to pull him over. He fled and was apprehended only after a two-mile vehicle chase. Four days later, he was charged in Milwaukee County Circuit Court with the state felony of eluding an officer, see Wis. Stat. § 346.04(3). That same day, federal authorities brought armed robbery charges against him in the Eastern District of Wisconsin for the last in his string of six bank robberies, namely, that of the Pyramax Bank in Milwaukee on August 18, 2010. On the basis of that complaint, a magistrate judge issued a warrant for Clark's arrest. The FBI used that warrant to file a detainer against him with the Milwaukee County Sheriff, who was holding him in state custody on the eluding charge.

Clark was convicted of the state offense and sentenced to seven months in jail on November 23, 2010. While he was still incarcerated for that crime, a federal grand jury returned a twelve-count indictment against Clark on February 8, 2011, charging him with armed bank robbery in violation of 18 U.S.C. § 2213(a) and (d), and using a firearm in furtherance of an armed bank robbery in violation of 18 U.S.C. § 924(c)(1)(A)(ii) for each of his six bank robberies. He was

arraigned seventeen days later, on February 25. Following a four-day jury trial he was convicted on all counts, and his motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29(c) was denied. He was sentenced to 151 months' imprisonment for each armed bank robbery count, to run concurrently, and to 300 months' imprisonment for each § 924(c) count, to run consecutively, for an aggregate sentence of a whopping 1,951 months in prison.

Clark has appealed, but his arguments do not focus on the facts underlying the convictions or the length of the sentence. Instead, he asserts that his prosecution violated the Speedy Trial Act and the Interstate Agreement on Detainers, and that some of the evidence against him was procured in violation of the Fourth Amendment. We consider these points in turn.

## II

Clark first argues that his conviction must be reversed because his prosecution failed to comply with the timing provisions of the Speedy Trial Act, 18 U.S.C. § 3161(b). We review legal questions about the application of the Speedy Trial Act *de novo*, and credit the district court's factual findings on any issues related to the Act's application unless they are clearly erroneous. *United States v. King*, 338 F.3d 794, 797 (7th Cir. 2003).

Under the Sixth Amendment, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial … ." U.S. CONST. amend. VI. The purpose of the right is to "limit the time during which criminal charges are hanging over a person's head unresolved." *United States v. Janik*, 723 F.2d 537, 542 (7th Cir. 1983). In order to "make effective"

this speedy trial guarantee, Congress passed the Speedy Trial Act of 1974, Pub. L. No. 93-619, 88 Stat. 2076. See S. Rep. No. 93-1021, at 1 (1974). The part of the Act relevant to this appeal provides:

> Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges.

18 U.S.C. § 3161(b).

The thirty days do not begin to run because of just any arrest based on the conduct that ultimately supports the federal prosecution. Two limitations are at work. First, because the states and the federal government are distinct sovereigns for purposes of criminal prosecutions, the speedy trial protections of the federal statute apply only to arrests made for federal charges—an arrest by a state officer on a state charge does not start the statutory clock. *Janik*, 723 F.2d at 542. Second, even an arrest by the federal authorities is insufficient if the person is immediately released without any federal charges being filed. *Id.* The Sixth Amendment speedy trial right, from which the Speedy Trial Act draws its substance, applies only to persons who are formally accused of a crime. *United States v. MacDonald*, 456 U.S. 1, 16 (1982). To qualify as a federal arrest and trigger the 30-day period under the Act, therefore, an arrest must be for the purpose of bringing federal charges, and charges must be "pending" when the person is arrested. Someone who is only the target of a criminal investigation has no right to have the government wrap up its investigation quickly and bring charges, even if the target is aware of the investigation. See *id.*; see also *United States v.*

*Samples*, 713 F.2d 298, 301 (7th Cir. 1983)(explaining that the Sixth Amendment right and the statute apply "only to an accused").

Clark suggests two alternative dates as triggers for his speedy trial clock, either of which would provide him the relief he seeks. The earlier one is the day he was arrested by Milwaukee police: October 8, 2010. Although he was arrested by state police, he maintains (vaguely) that the arrest "was involved with" federal charges. His point seems to be that the state officers arrested him with the ulterior motive of bringing federal charges, either because they were acting as the federal government's agents at the time or because the arrest was always meant to lead to federal prosecution.

If an agency relationship were present this might be a closer point, but Clark has no proof of agency. He bases his argument entirely on testimony by the arresting officer that his armed bank robbery was the reason for his arrest. He then reasons that the fact that his ultimate trial in federal court was on armed robbery charges amounts to proof that his original arrest was on this charge. Yet the record is devoid of any indication that the federal government was involved at all in his prosecution at the time of the October 8 arrest, let alone that it instructed the state authorities to arrest Clark or that it wanted him arrested so that it could initiate proceedings against him. Wisconsin unsurprisingly has its own laws against armed robbery. See Wis. Stat. § 942.32(2). The decision of state officials to arrest someone because he is wanted for conduct in violation of state law does not force the federal government to initiate whatever proceedings it might bring for the same underlying conduct

at the same moment. The federal arrest necessary to trigger the Speedy Trial Act did not occur on October 8.

Clark's second theory is that his speedy trial clock started with the filing of the federal complaint and detainer with the Milwaukee County Sheriff on October 12. He maintains that, because he would have been brought into federal custody that day if his state charges had vanished, these were the functional equivalent of a federal "arrest or summons" to initiate the 30-day period under the Speedy Trial Act.

Several of our sister circuits have considered the argument that some form of accusatory document short of an indictment—such as a complaint or detainer—is sufficient to trigger the 30-day rule even if the accused has not been brought into federal custody. They have almost uniformly rejected it. The key to their reasoning is that there must be a "federal deprivation of liberty" in connection with the detainer or complaint before the accused is entitled to the protections of the Speedy Trial Act. *United States v. Bloom*, 865 F.2d 485, 491 (2d Cir. 1989).

A good example is the Eleventh Circuit's decision in *United States v. Shahryar*, 719 F.2d 1522 (11th Cir. 1983) (per curiam). Shahryar was first arrested on state arson charges, and four days later a federal complaint was filed against him for violations of wire fraud and firearms statutes. A federal magistrate judge issued an arrest warrant and set a temporary bond; the warrant was lodged with state authorities as a detainer. Shahryar posted bond on his state charges five months after that, and was immediately taken into federal custody. He was indicted by a federal grand jury two weeks later. *Id.* at 1523. The court reasoned that the Act was not violated because the 30-day period did not begin until Shahryar

posted bond on his state charge and entered federal custody. Until that point, "there was no federal arrest of the appellant and no taking of him into federal custody." *Id.* at 1524. The court explained that "[f]or the time limit of the Act to commence a person must be held for the purpose of answering to a federal charge." *Id.* at 1524–25. It grounded its rule in the doctrine of dual sovereignty, "deeply rooted concepts of federalism," and "common sense." *Id.* at 1525.

Other circuits similarly have held that there must be both a federal charge and federal custody for the Speedy Trial Act to apply; neither one alone suffices. See *United States v. Bagster*, 915 F.2d 607, 611 (10th Cir. 1990); *United States v. Johnson*, 815 F.2d 309, 312 (5th Cir. 1987); see also *Bloom*, 865 F.2d at 491 (relying on *Shahryar* to hold that when a person is arrested and released on the same day without formal charges, and a complaint is filed after that release, the Speedy Trial Act does not apply until that person is brought back into custody). The only apparent holdout is the Eighth Circuit. It has not directly addressed whether the Speedy Trial Act's pre-indictment timing provision is triggered by a complaint alone, but it seemed to assume so in *United States v. Solomon*, 679 F.2d 1246, 1251–52 (8th Cir. 1982). We note, however, that this issue was not squarely presented in *Solomon*, and that the court there was deciding if an arrest alone triggered the Speedy Trial Act, or if the 30-day period began only when a complaint issued. *Id.*

Although we have not had the occasion to address the relation between a federal detainer and the Speedy Trial Act, we have held that recapture of an escaped prisoner does not begin the speedy trial clock for new charges stemming from the escape. See *United States v. Zukowski*, 851 F.2d 174, 177

(7th Cir. 1988). The defendant there argued that bringing him back into federal custody was necessarily an "arrest" for the purposes of the Act, but we reasoned that there was no "arrest" because "the restraints imposed on the prisoner [were] not new but [were] based on his original conviction." *Id.* Speedy trial rights, we said, "do not protect an individual against unreasonable delay before accusation by arrest or the filing of charges." *Id.* at 178. It is true that we were construing the constitutional rather than the statutory speedy trial right in that portion of the opinion. Nonetheless, because the Speedy Trial Act uses an arrest or summons as the trigger for the 30-day requirement, the principle is the same.

Returning to Clark's case, it does not take a significant extension of *Zukowski* to find that he was not "arrested" for purposes of the Speedy Trial Act when the detainer was lodged with Milwaukee police on October 12. The *sine qua non* of an arrest for purposes of the Act is the act of unambiguously bringing the accused into federal custody. Clark's detainer argument falls short of the mark for two reasons: he was not brought into federal custody at all on that date, and he was not subject to any restraints beyond those that Wisconsin already was imposing legitimately. We accordingly agree with our sister circuits that have held a "federal deprivation of liberty" is required to start the 30-day period under the Speedy Trial Act. Since neither of the dates Clark proposes initiated federal custody, we find no violation of the Act in Clark's prosecution.

### III

Clark's second challenge to his conviction requires us to consider another aspect of federal-state coordination on prosecuting criminals: the Interstate Agreement on Detainers

(IAD), 18 U.S.C. app. 2 § 2. The district court's application of the IAD presents a question of law that we review *de novo*. *United States v. Jones*, 454 F.3d 642, 646 (7th Cir. 2006).

The IAD is designed to ensure cooperation both between member states and between states and the federal government. The federal government and every state except Louisiana and Mississippi have signed the compact. The portion of the IAD at issue here is Article V, which governs when and how a state (or the federal government) wishing to prosecute a person already imprisoned in another state may take temporary custody of the prisoner for the purpose of pursuing its charges. Article V(d) provides in relevant part:

> The temporary custody referred to in this agreement shall be only for the purpose of permitting prosecution on the charge or charges contained in one or more untried indictments, informations, or complaints which form the basis of the detainer or detainers or for prosecution on any other charge or charges arising out of the same transaction.

18 U.S.C. app. 2 § 2 art. V(d).

Clark maintains that his prosecution violated Article V(d) and that the appropriate remedy is dismissal of his convictions. To evaluate his claim, we first must examine the detainer the FBI filed in his case. The complaint issued by the federal magistrate judge on October 12, 2010, contained two charges: armed bank robbery and brandishing a firearm in furtherance of such a robbery, both based on the last of Clark's six bank robberies. (The record does not reveal whether state or federal authorities were aware of Clark's connection with the other five robberies at that time.) The

detainer was lodged with the Milwaukee County Sheriff on the basis of those two charges. It remained in place, without amendment, throughout his state prosecution, until he was indicted on February 8, 2011, on the full complement of federal charges for which he was ultimately convicted. Clark argues that because only the two counts in the complaint "form[ed] the basis of the detainer" that led to his federal custody, under Article V(d) the federal government could prosecute him only on those counts. The IAD forbade, he asserts, the addition of other counts that were not part of the complaint on which the detainer was based.

The magistrate judge who first heard Clark's argument rejected it on the ground that Clark's presence in federal court was procured via a writ of habeas corpus *ad prosequendum* rather than a written request for a prisoner transfer under the IAD. See 18 U.S.C. app. 2 § 2 art. IV. But that distinction was rejected in the Supreme Court's decision in *United States v. Mauro*, 436 U.S. 340 (1978). There, while construing Article IV of the IAD, the Court held that once the federal government has filed a detainer, a writ of habeas corpus *ad prosequendum* is itself a "written request for temporary custody" for the purposes of the IAD. *Id.* at 361. Though that case involved Article IV's provisions governing the timing of interstate prosecutions, there is no material difference in this case between Article IV and Article V. As the Supreme Court explained, proceeding by way of the writ "in no way reduces the need for … prompt disposition of the charges underlying the detainer." *Id.* at 362. (There is one difference between the IAD process and the writ, however. As *United States v. Pleau*, 680 F.3d 1 (1st Cir. 2012) (en banc), notes, the writ of habeas corpus *ad prosequendum* is a stronger tool for the federal government, because a state governor has no power to refuse to

honor the writ, while the governor does have power to dis-approve a request for transfer under the IAD. *Id.* at 3, 6.)

The district court spotted the *Mauro* error and instead reasoned that the detainer was constructively amended by the February 8 indictment; at that point, the court ruled, the extra 10 counts of the indictment became additional bases for the detainer. The government admits on appeal that this reasoning is unprecedented and urges us in the alternative to hold that any violation of the IAD in this case was harm-less. Reversing Clark's convictions based on such a small vio-lation, it contends, would not serve the purposes of the IAD.

Our take is slightly different from the district court's. We note at the outset that Article V(d) says temporary custody is "*only for the purpose* of permitting prosecution" on an untried charging document that forms the basis of the detainer. This is different from temporary custody being "for the purpose of *prosecution only on charges* that form the basis of the de-tainer," which the IAD does not say. Clark's detainer was based on the armed robbery and firearm-brandishing charg-es arising out of the Pyramax Bank robbery. Under the IAD, he could be transferred so that the receiving sovereign could try him on those charges. The only wrinkle is that before the transfer occurred, a superseding indictment was returned that added more charges. Once he found himself in federal custody, he had to stand trial for both the original charges and the new ones, since they had been joined as Federal Rule of Criminal Procedure 8(a) permits. Thus, upon his transfer, Clark was tried both for the charges that formed the basis of his original detainer and for the additional charges raised in the superseding indictment.

As long as the original charges are not lodged in bad faith or fraudulently as a basis for obtaining a detainer, or the later-added charges are not improperly delayed to avoid the strictures of the IAD, we see nothing to prevent the addition of new charges. Suppose the government had taken Clark's view of the matter and had tried him only on the charges that supported the detainer. Surely Clark does not mean that the government was forever barred from bringing the additional charges related to the other five bank robberies. Once the first trial was over, the government could have sought a new indictment (assuming no statute-of-limitations problem) and proceeded with a new trial, maybe even under a new detainer. But what sense would there be in such a rule? The purpose of the IAD is to "prevent competing jurisdictions from transferring prisoners back and forth, because such transfers can undermine the prisoner's right to a speedy trial and the rehabilitative process of the system in which the prisoner is currently serving a sentence." *United States v. Jones*, 938 F.2d 447, 448 (3d Cir. 1991).

Article V(d) in particular was designed to "safeguard the prisoner's right to contest the transfer by appealing to the Governor of the sending state pursuant to Article IV(a) of the IAD," which allows governors to disapprove requests for temporary custody within 30 days. *Cooney v. Fulcomer*, 886 F.2d 41, 44 (3d Cir. 1989); but see *Pleau, supra.* That purpose is fully served in situations such as this one, where the ultimate transfer is for the purpose of trying the original charges that formed the basis of the detainer, and the additions to the indictment are imposed before the prisoner is transferred. The system Clark seems to be proposing would actually work at cross-purposes with the IAD, insofar as it would require the federal government to send Clark *back* to Wiscon-

sin so that it could re-indict him and lodge a new detainer before bringing him back to federal custody for a trial.

Clark has not alleged any prejudice that flowed from the fact that the government did not file a new detainer after the indictment. Relying on *Alabama v. Bozeman*, 533 U.S. 146 (2001), he argues instead that the doctrine of harmless error is categorically unavailable for violations of the IAD. *Bozeman* held that there is no *de minimis* exception to the anti-shuttling provision of Article IV(e) of the IAD, which requires that a transferred prisoner be tried in the receiving state before being returned to the sending state. The wording of Article IV(e) was central to the Court's reasoning: it says that if a prisoner is returned to the sending state before trial, the indictment "*shall not* be of any further force or effect, and the court *shall* enter an order dismissing the same with prejudice." *Bozeman*, 533 U.S. at 153 (quoting 18 U.S.C. app. 2 § 2 art. IV(e)). This language, the Court said, left no room for an exception for *de minimis* violations.

Article V(d), in contrast, does not mandate any consequence. This distinguishes it not only from Article IV(e), but also from other parts of Article V, such as Article V(c) (directing courts in the jurisdiction where an indictment was issued to dismiss it with prejudice if the jurisdiction "refuses or fails to accept temporary custody" of a prisoner pursuant to a detainer). The drafters knew how to require dismissal of an action for failure to comply with provisions of the IAD, and their decision not to impose that draconian consequence for violations of Article V(d) should not be disregarded.

Automatic reversal of a criminal conviction is generally imposed only when the type of error at issue is "so intrinsically harmful as to require automatic reversal (*i.e.*, "affect

substantial rights") without regard to their effect on the out-come." *Neder v. United States*, 527 U.S. 1, 7 (1999). While Congress can modify that rule by statute for particular types of error—as it did in Article IV(e) of the IAD—in the absence of such a legislative command, we subject most alleged errors to harmless error analysis. See *id.* at 8. Harmless error analysis seems particularly appropriate here, where even if there was a violation, Clark has not identified a single reason why he was harmed by the supposed violation of the IAD or why the anti-shuttling purpose of the agreement was undermined. Accordingly, even though we do not think the IAD was violated, we are satisfied that if it was, harmless error analysis applies to the type of claim Clark is raising, and any error here was harmless.

**IV**

Clark's final claim is that a search warrant issued for his DNA while he was in the Milwaukee County jail failed to satisfy the Fourth Amendment's particularity requirement. Shortly after Clark's initial arrest, a state judicial officer issued a search warrant to conduct a buccal swab for DNA from "Ernest F. Clark, B/M [black male], 11-01-1968 at the City of Milwaukee Prisoner Processing Center." The DNA obtained from this search was later linked to a mask and pair of gloves found during the investigation of Clark's last bank robbery. Clark argues that this evidence should have been suppressed because his birthdate (at least using the month-day-year ordering common in the United States) is 01-11-1968 (*i.e.* January 11, not November 1).

The particularity requirement of the Fourth Amendment protects against open-ended warrants that leave the scope of the search to the discretion of the officer executing the war-

rant, or permit seizure of items other than what is described. *E.g.*, *Stanford v. Texas*, 379 U.S. 476, 485–86 (1965). A warrant satisfies this requirement if it leaves nothing about its scope to the discretion of the officer serving it. *Jones v. Wilhelm*, 425 F.3d 455, 462 (7th Cir. 2005).

The warrant issued for Clark's DNA was not unconstitutionally vague. It correctly identified his name, race, sex, and the location where he was housed, and contained what is at most a transposition of the date and month of his birthday. This small error (if it was one, and not just a rendering of his birthday in the day-month-year order that is common throughout much of the world and used by the U.S. military) casts no doubt on the fact that Clark was the intended target. It did not give the officer discretion to search anyone but him, or to collect anything but Clark's DNA by means of a buccal swab. There was no confusion about who was to be searched and what was to be collected; the Fourth Amendment is not a bulwark against typos.

\* \* \*

We are satisfied that there were no statutory or constitutional errors requiring reversal of Clark's convictions. The judgment of the district court is AFFIRMED.