STATE OF MAINE                          UNIFIED CRIMINAL DOCKET
KENNEBEC, ss.                           DOCKET NO. CD-CR-18-548


STATE OF MAINE


v.                                      ORDER ON DEFENDANT'S
                                        MOTION TO SUPPRESS


ALEX KANARIS,
        Defendant


        The defense has moved to suppress "any and all evidence" seized as a result of the search warrant issued in this matter upon grounds that the warrant issued was without sufficient probable cause and in violation of the Fourth Amendment to the United States Constitution as well as that of the State of Maine Constitution. The State has objected. The Court makes the following Findings of Fact and Conclusions of Law upon which the **Order** set out below is based:

        1. At the outset, the undersigned recognizes that the Court must give great deference to the issuing magistrate, i.e. courts must give the supporting affidavit a positive reading and review the affidavit with all reasonable inferences that may be drawn to support the magistrate's determination. *State v. Estabrook*, 2007 ME 130, ¶ 5, 932 A.2d 549. Whether probable cause exists for a warrant to issue must be evaluated solely within the four corners of the affidavit. *State v. Johndro*, 2013 ME 106, ¶¶ 9, 12, 82 A.2d 820. The Court should draw all reasonable inferences from the affidavit to support a finding of probable cause, and limit any inquiry to whether there is a substantial basis for the finding of probable cause under the totality of the circumstances test. Such a test requires "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the veracity and basis of knowledge of persons supplying the hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Wright*, 2006 ME 13, ¶ 8, 890 A.2d 703.

**The following facts are taken from MDEA Special Agent Todd Chilton's Affidavit and Request for a Search Warrant dated April 2, 2018:**

        2. MDEA made three controlled purchases of cocaine HCL, cocaine base, and heroin from Maurice Wilson ("Wilson") on January 8, 2018, January 29, 2018, and March 1, 2018. Statement of Probable Cause ¶ 1 (SPC). The reader is not told where these controlled purchases were made.

3. On March 19, 2018, while under surveillance, Wilson stepped outside 38 Water Street, Apartment 2 in Augusta and got into a vehicle that was later stopped. SPC ¶ 1.

4. MDEA later learned that Apartment 2 is rented by a John Rolfe ("Rolfe"), date of birth 6/6/48.[1] SPC ¶ 1. After leaving the vehicle, Wilson was arrested on three counts of aggravated trafficking and told Special Agent ("SA") Chilton that he sold drugs to support his habit. SPC ¶ 2. There is no mention in the affidavit that Wilson conducted any sort of drug activity while at 38 Water St, Apartment 2.

5. On April 2, 2018, SA Walker was informed by staff at the Augusta Inn that Rolfe[2] rented a room on March 30 ("Room 209") and paid cash for each night. SPC ¶ 3. The staff advised SA Walker of "what they believed to be drug activity." SPC ¶ 3. There is no further description in the affidavit of what the staff members observed, heard, smelled, or any other facts that led them to believe this. The reader also doesn't know if "staff" is one, two, or more persons.

6. Andrew Redmond ("Redmond") paid cash for Room 209 while Rolfe was still occupying it for the night of April 2. SPC ¶ 3. Through his training, education, and experience, SA Chilton knows that drug traffickers often rent hotel rooms to conduct their business in order to "keep the spotlight off their residences." SPC ¶ 3.

7. MDEA conducted surveillance of Room 209 and the vehicles and people associated with it.[3] SPC ¶ 4. MDEA observed Rolfe, Redmond, Alex Kanaris ("Kanaris") and Krystal Clark ("Clark") coming and going from the room. SPC ¶ 4. Kanaris's home address is 396 Pond Road in Sidney, Maine and MDEA "has received information" that he has been selling drugs from his residence. SPC ¶ 4. There is no explanation in the affidavit of how MDEA received this information or what the information specifically was, such as when the sales were made, etc.

---

[1] SPC ¶ 1 lists John Rolfe's date of birth as June 6, 1948. In the Description of the Place(s) or Person(s) to be searched, a John Rolfe with a date of birth of March 23, 1980, is listed. This younger Rolfe is also listed as "Renter and Occupant" of the premises. It is not clear if these "John Rolfes" with two different dates of births are actually the same person, and a mistake was made, or if this is perhaps a junior/senior issue. SPC ¶ 10 states "[a] known drug trafficker was arrested after leaving John Rolfe's apartment on March 19th. Rolfe has now rented a hotel room within a few miles of his residence . . ." This suggests that the "John Rolfes" are the same person, unless the MDEA missed the fact that these are two different people aged 71 years old and 39 years old. There is nothing else in the affidavit that indicates they are family, two different unrelated people, or anything additional to suggest that they are the same person. Regardless, this creates a definite problem with the affidavit, and any probable cause related to Wilson leaving the "older" Rolfe's apartment is problematic.

[2] No date of birth is given for this "Rolfe.".

[3] No date is given for the surveillance.

2

8. Clark was on Conditions of Release entered December 1, 2017 for a Violating Conditions of Release charge and her home address listed on the conditions is the same address as Kanaris's. SPC ¶ 7. Nothing in the affidavit explains what her conditions of release are or how she violated her prior conditions. After checking a law enforcement computer system, SA Chilton found that Redmond was arrested by State Police on March 1, 2017, for Unlawful Possession of Scheduled Drugs. SPC ¶ 7.

9. During surveillance, Rolfe, Redmond, and Kanaris left the Room and got into a blue Hyundai Elantra[4] driven by Redmond. SPC ¶ 4. Before Redmond left the parking lot, SA Chilton saw him "pull out a silver pipe, which is commonly used to smoke illegal substances, to include but not limited to [crack]." SPC ¶ 4. The affidavit does not state whether SA Chilton observed him pack or use the pipe with any sort of substance. At some point, Clark left Room 209 and got items from the trunk of Kanaris's car.[5] SPC ¶ 5. She put on perfume, pulled out a roll of toilet paper from the trunk, and pulled out a clear plastic baggie from inside the toilet paper roll which she put in her purse that she also got out of the trunk. SPC ¶ 5. She brought the toilet paper roll and the purse back inside Room 209. SPC ¶ 5.

10. Later that night, around 7:30 p.m., Rolfe left the Augusta Inn in the Hyundai. SPC ¶ 6. He drove to Washington Street in Augusta, picked up a man who sat in the front seat, drove around the block, dropped the man off at the same spot he had picked him up at, and then returned to Room 209. SPC ¶ 6. Through his training, education, and experience, SA Chilton knows that drug traffickers often pick up drug users, drive around the block, and conduct their business in the vehicle. SPC ¶ 6.

11. SA Chilton spoke with Detective Matt Estes of the Augusta Police Department who supplied him with the following information.[6] SPC ¶ 8. On February 16, 2018, CI#2[7] informed Detective Estes that he/she observed Redmond in an Augusta apartment with heroin and cocaine base, and watched numerous drug transactions occur when individuals arrived at the residence. SPC ¶ 8. On March 19, 2018, CI#2 informed Detective Estes that he/she saw Redmond arrive

---

[4] According to the Description of the Place(s) to be Searched, the Hyundai Elantra is owned by Hertz Rental Company.

[5] A 2009 silver Dodge Charger.

[6] From its wording, the undersigned ponders whether the second and third paragraph contained in paragraph 8 of the Affidavit was pulled directly out of a prior warrant request made by Estes.

[7] There is no information given about CI#2. Nothing indicates whether he/she has provided reliable information in the past, if he/she received any sort of benefit for the information that was provided, or whether the CI has ever provided false information in the past, etc. CI#2 is the only confidential informant listed in the Affidavit. It is unclear why this informant is referred to as CI#2 when there is no CI#1.

at the same Augusta apartment, and Redmond again had heroin and cocaine base. SPC ¶ 8. CI#2 observed a couple grams of cocaine and heroin that amounted to a size a little bigger than a golf ball. SPC ¶ 8. Through Detective Estes' training, education, and experience, this equated to at least an ounce of heroin. SPC ¶ 8. CI#2 told Detective Estes that Redmond started bagging up the drugs when he got to the apartment, and that he arrived in a rental vehicle.[8] SPC ¶ 8.

12. Finally, during surveillance, SA Richards told SA Chilton that Rolfe left the Augusta Motor Inn and drove to Green Street in Augusta, where he observed a man approach the driver's side window, and "an exchange took place, which is consistent with a transaction of scheduled drugs." SPC ¶ 9. Based on the totality of the information, SA Chilton believed that the illegal sale and distribution of scheduled drugs was occurring at Room 209 by Rolfe, Redmond, Kanaris, and Clark. SPC ¶ 10. Specifically, he based his conclusion on the following:

> [a] known drug trafficker was arrested after leaving John Rolfe's Apartment on March 19th. Rolfe has now rented a hotel room within a few miles of his residence and based on my Training, Education and Experience this is indicitive [sic] to avoid detection of his residence where illegal drugs have been sold. Additionaly, [sic] seen with Rolfe in Room 209, on this date, were Kanaris and Redmond who MDEA have received information about in the illegal sale of scheduled drugs, and Rolfe was seen exiting this room and engaging what my Training, Education and Experience is consistent with a transaction of scheduled drugs.

SPC ¶ 10. The remainder of the affidavit is a description of SA Chilton's training, education, and experience, and boilerplate regarding what drug traffickers commonly keep on their persons or near them in their vehicles or residences. SPC ¶¶ 11-12. The warrant was reviewed by an Assistant Attorney General, SPC ¶ 13, and subsequently signed by a judge on April 2, 2018.

13. The first question the undersigned has to answer is did the four corners of the affidavit contain sufficient probable cause for a search warrant to issue? The affidavit must be read in a positive light in support of the warrant, and the reviewing court must "consider all reasonable inferences that may be drawn from information in the affidavit." *State v. Samson*, 2007 ME 33, ¶ 11, 916 A.2d 977.

14. An "officer's personal knowledge of facts and circumstances, in combination with any reasonably trustworthy information conveyed to them" is enough for the existence of probable cause when a reasonable person would believe that evidence of a crime was to be seized. *State v. Higgins*, 2002 ME 77, ¶ 21, 796 A.2d 50 (citing *State v. Kennedy*, 645 A.2d 7, 9 (Me. 1994)). In determining the existence of probable cause, the judicial officer "must rely on 'factual and practical considerations of everyday life on which reasonable and prudent persons, not

---

[8] A grey Mitsubishi with plate number VWB6806.

legal technicians, act.'" *State v. Samson*, 2007 ME 33, ¶ 11, 916 A.2d 977 (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (alteration omitted)).

15. For probable cause to exist, "the warrant affidavit must set forth some nexus between the evidence to be seized and the locations to be searched." *Samson*, 2007 ME 33, ¶ 15, 916 A.2d 977. The nexus does not have to, and often will not, "rest on direct observation, but rather can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide evidence of a crime." *Id.* ¶ 15 (quoting *United States v. Feliz*, 182 F.3d 82, 88 (1st Cir. 1999) (alterations omitted). Despite an affidavit's deficiency in certain areas, probable cause may still be established. *State v. Rabon*, 2007 ME 113, ¶ 23, 930 A.2d 268.

16. Neither the State nor the Defendant originally addressed the fact that the affidavit and Request for a Search Warrant lists two different date of births ("DOB") for Rolfe. The reason that the discrepancy in the DOBs is significant is because part of SA Chilton's probable cause determination was based on a known drug trafficker leaving the "older" Rolfe's apartment. However, the probable cause is also based on Rolfe (presumably the younger, because of the description of persons and places to be searched) renting the hotel room within a couple miles of his residence. If these are two different John Rolfes, the probable cause determination becomes more problematic and the nexus between the evidence and the hotel room is weakened.

17. No caselaw in Maine could be found regarding typographical errors in search warrants, nor could anything substantial be found within the jurisdiction of the First Circuit.[9] However, the Maryland Court of Appeals[10] considered an analogous, but not identical, "typo" issue in a search warrant. There, on April 15, **2004**, the officer applied for a search warrant of the defendant's premises, person, and things, and a judge granted it on the same date. *Greenstreet v. State*, 898 A.2d 961, 964 (Md. 2006). Regarding probable cause to support the warrant's issuance, the affidavit made reference to a trash seizure of the defendant's residence on **04-14-03**, in which drug packaging and residue was found. *Id.* at 965. At the motion to suppress hearing before the trial court the defendant argued, and the State conceded, that the warrant was facially stale "because the affidavit indicated that the trash seizure was executed (14 April 2003) more than one year before the warrant's issuance (on 15 April 2004)." *Id.* at 966.

18. The State argued that it was a typographical error, and that if the officer was allowed to testify, he would have stated that he intended the date in the affidavit to be 2004. *Id.* at 967. Ultimately, the trial court determined that it could

---

[9] The First Circuit has found that an ATF Task Force Agent's typo in dating a report March 13, 2013, instead of March 16, 2013, was inconsequential and did not warrant suppression of his statements. *United States v. Torres-Figueroa*, No. 13-150, 2013 U.S. Dist. LEXIS 179333, at *26, *40 (D.P.R. Aug. 16, 2013).

[10] Maryland's highest court.

not consider information outside the four corners of the affidavit, and granted the defendant's motion to suppress. *Id.* at 968. In addressing the good faith exception argument that the State made, the trial court concluded that the rule "was not applicable because the police officer lacked an objective, reasonable good faith basis to believe that the warrant was issued properly by the District Court judge due to the facial staleness of probable cause. In addition, the hearing judge found that the officer "was reckless in preparing the application."" *Id.*

19. The State then appealed to the Court of Special Appeals[11] arguing that the judge that signed the warrant could have concluded from the four corners of the affidavit that trash seizure was actually April 14, 2004, meaning that probable cause existed and the warrant was not stale. *Id.* at 968. The Court of Special Appeals reversed the judgment of the trial court, determining that probable cause existed within the four corners of the affidavit after it had "looked to a number of cases from foreign jurisdictions to support the proposition that if the affidavit contained an identifiable and certain clerical error, such as a date material to the probable cause finding, the warrant should not be vitiated."[12] *Id.* at 969.

20. Upon the defendant's appeal, Maryland's highest court determined that it was error for the intermediary appellate court to infer "that the issuing judge recognized the purported typographical error in the affidavit, ignored it, and found a substantial basis to support her finding of probable cause based upon a trash search conducted on 14 April 2004, rather than 14 April 2003." *Id.* at 972. This is because

> [c]lose review of the affidavit supporting the warrant is the purpose of the warrant process itself. To countenance otherwise is to degrade the purpose of requiring a magistrate or judge to review and issue warrants. A reviewing court does not rewrite deficient or inaccurate warrants after the search has been executed, especially where there is no evidence the issuing judge noticed the problem and, in any event, failed to correct it when appropriate to do so.

*Id.*

---

[11] Maryland's intermediate appellate court.

[12] Those cases are discussed in *State v. Greenstreet*, 875 A.2d 177, 184-86 (Md. Ct. Spec. App. 2005). Almost all of those cases involved typos regarding years, where the date was off by one year, or sometimes mere hours from one day to the next. In the cases where the dates were off by a year, they were often in January or February – when most people accidentally write in the year that just passed. Some of those courts allowed testimony to correct the year in order to avoid an "unthinking or over technical application" in review of search warrant affidavits. *Id.* at 184. Other cases did not allow outside testimony, but would not suppress the evidence if the correct date could be inferred from elsewhere in the affidavit, such that the wrong date was a "mere scrivener's error[]" and the "circumstances fairly indicate[d] that the intended reference was to the current year." *Id.* at 185 (citing 2 W. LaFave, *Search and Seizure* § 3.7(b), at 362 (3d ed. 1996)).

21. In short, the affidavit did not present enough "internal, specific, and direct evidence from which to infer a clear mistake of a material date upon which the affiant police officer depended for probable cause." *Id.* at 973-74. The Court of Appeals ultimately affirmed the trial court's conclusion that the affidavit did not provide a substantial basis for a probable cause finding because of staleness. *Id.* at 974.

22. Because so much of the caselaw regarding typos of dates creates staleness issues, this is what most cases interpreting *Greenstreet* have focused on. The present case is different because it is not merely a single years' difference in a date, but instead an entirely different month, day, and year, creating an age gap of 39 years. Despite this, this Court could undertake a similar analysis and determine if within the four corners of the affidavit there is enough to disregard the inconsistency.

23. The undersigned determines that there is not. The only thing that suggests that the 71-year old Rolfe that rented the apartment is the same 39-year old Rolfe present at the Augusta Inn is one line in SA Chilton's affidavit in which he states a known drug trafficker was arrested after leaving the apartment, and now Rolfe has rented a hotel room. Nothing suggests that the MDEA even caught this discrepancy in ages and accounted for it in any way, or whether the judge issuing the search warrant caught this issue, clarified it, and approved the warrant based on the clarification while the officer was still under oath.

24. Because of the above analysis, any inferences that could be made to support probable cause based on Wilson, a known drug trafficker, leaving the older Rolfe's apartment, cannot be used to support the issuance of the warrant to search Room 209, rented by the younger Rolfe.

25. Accordingly, the next question for the Court to consider is, without considering Rolfe's link to 38 Water Street Apartment 2, is there enough regardless in the affidavit to establish probable cause? Without considering Wilson's tie to the older Rolfe, the younger Rolfe is not associated to the known drug trafficker, Wilson. Nor could it be considered that it is the same Rolfe that is even occupying Room 209, thereby eliminating the conclusion that Rolfe is renting the Room only a few miles from his residence in order to "keep the spotlight off his residence." This is a damaging blow to the nexus element required for a finding of probable cause in this case. Therefore, the only ties to drug activity occurring in Room 209 would be the following:

- Hotel staff reporting "what they believed to be drug activity."
- Rolfe, Redmond, Kanaris, and Clark coming and going from the Room.
- Redmond had been arrested just over a year before for unlawful possession of scheduled drugs.[13]

---

[13] In its Motion to Deny Defendant's Motion to Suppress Memorandum, the State says that Redmond was arrested the previous month for a drug offense. This is inconsistent with the affidavit states that Redmond was arrested for a drug offense on March 1, 2017. SPC ¶ 7.

7

- Observations from Detective Estes' CI#2, unsupported in the affidavit with information regarding his/her veracity or reliability, that Redmond was involved in drug activity at a residence in Augusta in February and March 2018, and had a rental car at that time.
- Rolfe leaving the Room and engaging in what the MDEA describes as two separate drug transactions
- MDEA's information, unsupported by any detail in the affidavit, that Kanaris was involved in drug activity in the central Maine area.
- Clark being on unidentified bail conditions.

26.     The State argues that based on the totality of the circumstances, this amounts to sufficient detailed information in the affidavit for the issuing judge to make a finding of probable cause to believe that drug trafficking was occurring inside and outside of Room 209. The State compares this case to *State v. Allard*, where the Law Court affirmed the denial of a motion to suppress based on "1) the observations of neighbors, 2) police surveillance revealing drug related activity, 3) presence of known drug users and traffickers, and 4) a controlled drug purchase by a CI." State's Mot. to Deny p. 3.

27.     First, the State tries to compare the "observations of civilian hotel staff who stated their belief that drug activity was occurring from the room" to the observations of the neighbors in *Allard*. However, the affidavit does not provide a basis for their belief. It is unknown whether the hotel staff based their belief on many people coming and going from the room in short periods of time, on odors emanating from the room, or on anything else suspicious. In the affidavit, hotel staff do not allege <u>any</u> suspicious activity of Rolfe, Redmond, Clark, or Kanaris. Additionally, in *Allard*, the observations of the defendant's neighbors in that case, as outlined in the affidavit, included the defendant's landlady hearing a woman yell to people in a car out front "do you guys want pot[?]" and then the woman running into the apartment. 674 A.2d 921, 922 (Me. 1996). A different neighbor heard a male on another occasion holler "if anybody wants pot, you can get it over there" and indicated the defendant's apartment. *Id.*

28.     In *Allard*, there was also high traffic in and out of the apartment leading the police to believe drug trafficking was occurring and that marijuana would be found within. *Id.* Here, the only comings and goings from the Room outlined in the affidavit are those of the people named in the warrant. Rolfe driving to Washington Street and picking up a man, driving around the block, and dropping him back off cannot be viewed through the lens of him being associated with a known drug trafficker as that is the older Rolfe that is associated with Wilson. For the same reason, whatever "exchange" occurred at the driver side window on Green Street similarly cannot be viewed through the lens of him being associated with a known drug trafficker. These instances may have probative value, but not near as much weight as they would hold if Rolfe could be associated with Wilson.

29.     So far as Redmond being seen with a silver pipe that could be used to smoke crack or heroin, nothing in the affidavit alleges that the officer actually saw him using the pipe. Bearing on that further, the affidavit does not state <u>what</u> drug

8

or drugs Redmond was arrested for possessing in 2017. It could have been heroin or cocaine, or it could have been that he had too many ounces of recently legalized marijuana.

30. Regarding Clark, it is troublesome that the affidavit does not state what she was on conditions of release for, nor what conditions of release she violated. If it were drug conditions that would certainly be relevant. If it were for violating a Protection From Abuse Order, that would be completely irrelevant. Regarding the clear plastic baggie that she pulled out of the toilet paper roll, this could be indicative of drugs, or, considering that she just sprayed herself with perfume, it could have been some other toiletry.

31. The lack of information regarding CI#2, and how the MDEA "received information" about Kanaris is also an area of concern. The State argues that it is immaterial that the affidavit does not specify whether CI#2 had previously given credible information because "it is neither 'practical' nor comports with 'common-sense' that Detective Estes would pass along to another law enforcement officer information he knew, or believed, to be not credible or inaccurate." State Mot. to Deny p. 4. The State then cites to the dissent in *State v. Rabon*, in which Chief Justice Saufley wrote that "[t]he police should be able to rely on corroborated information provided by informants who are close to drug dealers, to aid the State's efforts to interdict the drug trade," 2007 ME 113, ¶ 58, 930 A.2d 268. The State alleges that the information was corroborated by the MDEA's surveillance.

32. Kanaris contends that there is no detail about how the MDEA received information that he had been selling drugs out of his home, when it had occurred, or whether the information was even reliable. Kanaris also attacks the unnamed CI that spoke to Detective Estes because there was no information established in the affidavit about CI#2's veracity or reliability.

33. The Law Court has outlined considerations for how to evaluate probable cause when confidential informants are involved.

> Where a warrant affiant relies on informants, the court considers, together with all other facts presented within the four corners of the affidavit, (1) the informant's reliability and basis of knowledge, (2) the informant's claims about the defendant's criminal activities, and (3) other information about the defendant. '[T]he totality-of-the-circumstances approach permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip.'

*State v. Nunez*, 2016 ME 185, ¶ 20, 153 A.3d 84 (quoting *State v. Arbour*, 2016 ME 126, ¶ 12, 146 A.3d 1106).

34. An informant's tip has indicia of reliability if it includes first-hand accounts of illegal activity, the informant has been reliable in the past, and if it includes information about the informant's own involvement in illegal activity that could expose him or her to criminal liability. *Nunez*, 2016 ME 185, ¶ 21, 153

9

A.3d 84 (citations omitted). When sufficient information regarding an informant is lacking, his "assertions can still support probable cause if the affidavit contains 'something more,' such as corroboration by outside sources." *Arbour*, 2016 ME 126, ¶ 13, 146 A.3d 1106 (quoting *Rabon*, 2007 ME 113, ¶¶ 29-30, 930 A.2d 268).

35.   In *Rabon*, the Law Court concluded that the affidavit did not provide enough information about the CI to support probable cause and that the information the CI did provide was "readily available."[14] 2007 ME 113, ¶ 34, 930 A.2d 268.   There, the CI initiated contact with law enforcement to give information in exchange for "prosecutorial consideration if any information provided [was] helpful in a drug trafficking case." *Id.* ¶ 26.   The CI was not on probation, but on bail for non-drug related offenses, did not "receive any remuneration in exchange for the information," and had provided other information on local drug trafficking. *Id.* The Law Court zeroed in on the fact that the affidavit did not state whether the other information the CI provided had been accurate, or any other details about what the other information was. *Id.* It also discussed that no law enforcement officer stated within the affidavit that the CI had been found, or was at least believed to be, credible. *Id.* ¶ 27.

36.   Also concerning to the *Rabon* Court was the affidavit's lack of explanation about the CI's basis of knowledge for the information he provided. *Id.* The Law Court pointed out specifically that the affidavit did not address any first-hand knowledge of criminal activity or contraband. *Id.* Finally, the Law Court addressed that this CI was not a disinterested citizen, but instead someone who provided information with the intent of lessening his own exposure to criminal sanctions. *Id.* ¶ 28.

37.   To this extent, the Court quoted a treatise explaining that, "[c]ourts are much more concerned with veracity when the source of the information is an informant from the criminal milieu rather than an average citizen who has found himself in the position of a crime victim or witness." *Id.* (quoting 2 Wayne R. LaFave, *Search and Seizure* § 3.4 at 219 (4th ed. 2004)) The Law Court concluded that,

> [i]n short, the affidavit offers no information of the type commonly presented in search warrant affidavits that would allow a magistrate to form an opinion regarding an anonymous or confidential informant's reliability or basis of knowledge. In all but a few of the warrant affidavits involving confidential or anonymous informants we have considered since *Gates*, the affidavits included at least a modicum of information that addressed the informant's reliability or basis of knowledge.

*Rabon*, 2007 ME 113, ¶ 29, 930 A.2d 268. Because of this, the Court next turned to the "something more" that is often provided by law enforcement seeking

---

[14] The warrant discussed in *Rabon* is listed as Appendix A to the opinion.

warrants.[15] This information can be provided by the officers themselves, or from non-confidential sources. *Id.* ¶ 30 n.7. In *Rabon*, the police partially corroborated information that the defendants had made a trip out of state to pick up cocaine by observing that their vehicle was not in their driveway, but did return on a date that the CI stated it would. *Id.* ¶ 32. The Court noted though that the absence and reappearance of the vehicle, by itself, was not "contextually suspicious." *Id.* ¶ 31.

38. Everything else the police corroborated regarding the defendants, i.e. names, addresses, vehicle, color of their apartment, etc., was "readily available information" that showed the CI was familiar with the defendants. *Id.* ¶ 33. That information showed that the CI was generally familiar with local drug trafficking, but the affidavit failed to corroborate more specific information provided by the CI such as the defendants' ownership of a karaoke business, or if the defendant had been to the bars where the CI alleged drug trafficking occurred. *Id.* Because of this, "[n]one of the preceding information qualifie[d] as 'inside information' that would be uniquely available to an informant with direct knowledge of otherwise uncorroborated criminal activity." *Id.* ¶ 34. Instead, it only showed that the CI was familiar with the defendants and local drug trafficking. *Id.*

39. In assessing the totality of the circumstances analysis, the Court noted that law enforcement was "in the middle of a promising investigation," but the affidavit did not contain sufficient "information that establishe[d] the informant's reliability or basis of knowledge, or corroborate[d] in any significant way the informant's claim that the [defendants] purchased cocaine in Florida for resale in Maine." *Id.* ¶ 35. Law enforcement's partial corroboration of the van's absence and reappearance was not enough to provide the "something more" that was required due to the lack of information about the CI's credibility or basis of knowledge, and therefore the affidavit did not show a "fair probability that contraband or evidence of a crime would be found" in the apartment. *Id.* The Court determined that the evidence should have been suppressed. *Id.* ¶ 36.

40. In contrast, the affidavit in *Arbour* did provide sufficient probable cause for the warrant to issue. There, the informant was not a CI, but an identified man, Howard, who had been recently arrested for outstanding warrants and a probation violation. 2016 ME 126, ¶ 2, 146 A.3d 1106. While in county jail, Howard agreed to give information about stolen property in his possession and law enforcement agreed to have his probation hold lifted. *Id.* After the hold was lifted, Howard then explained his part in the operation selling stolen tools for the defendant, gave specific information about trips he made to sell items to pawn shops for the defendant, and said he bought drugs from him. *Id.* Law enforcement matched the description of a tool that Howard recently saw at the defendant's apartment to a tool that was recently reported stolen. *Id.* Police also confirmed that Howard had sold tools to the pawn shops that he told them about earlier. *Id.*

---

[15] To this extent, *Rabon* cited a string of cases where law enforcement corroborated tips by looking towards utility records and use of infrared observation, observing marijuana gardens at a seasonal camp and confirming some information that the defendant lived at the camp, and police observations of "suspicious activity" over an eleven-day period at a residence. 2007 ME 113, ¶ 30, 930 A.2d 268.

Finally, Howard drew a map for law enforcement of the defendant's apartment that showed stolen tools and a marijuana growing operation located in the attached attic. *Id.* A search warrant issued based in part on this information.

41. The defendant alleged that the affidavit in support of the search warrant did not establish probable cause and that the trial court erred in denying his motion to suppress. *Id.* ¶ 11. The defendant attacked the affidavit for its failure to "set forth sufficient information establishing Howard's veracity or reliability." *Id.* (alterations omitted). The Court explained that:

> the affidavit (1) provided detailed information about the named informant, Howard, and explained how he had come to directly observe contraband in the apartment; and (2) noted that Howard had provided highly specific information, including a hand-drawn map of the apartment. The affidavit also contained statements by Howard against his penal interest. Furthermore, the police corroborated Howard's assertions that he had pawned or sold tools as he described and that he had observed a possibly stolen air compressor in the apartment. *Id.* ¶ 14.

42. Because of the foregoing, *Arbour* was distinguished from *Rabon* where there was a dearth of information about the CI himself, and police only corroborated "readily available information." *Id.* In contrast, Howard gave law enforcement "inside information" about criminal activity and contraband within the defendant's apartment. Howard's criminal history involving crimes of dishonesty that were listed in the affidavit, and the fact that police arranged for his release from jail on the probation hold before Howard gave them the information were factors to be appropriately considered when determining his reliability. *Id.* ¶ 15. Regardless, Howard's information, combined with other information in the affidavit,[16] and "the deference that must be shown to the judge who issued the warrant," provided a substantial basis for probable cause for the issuance of the warrant, and the trial court did not err in denying the defendant's motion to suppress. *Id.* ¶¶ 15-16.

43. Turning to the case at bar, to accept the State's argument that Detective Estes would not pass along CI#2's information unless he believed it to be credible would essentially ignore long lines of caselaw stating that a judge issuing a warrant must at least consider the veracity and basis of knowledge of an informant when weighing his or her statement for probable cause considerations. A judge cannot adequately complete his task if he is not given this information.

44. Here, the affidavit provides that the "MDEA has received information that Kanaris has been selling drugs in the Central Maine Area from his residence . . ." SPC ¶ 4. No further detail is provided about the MDEA received this

---

[16] Law enforcement found that the defendant's criminal record showed that "he had been previously convicted of drug crimes and dealing in stolen property" among other things. *State v. Arbour* 2016 ME 126, ¶ 15 n.11, 146 A.3d 1106.

information. There is no way for the undersigned to know how the MDEA got this information because the affidavit does not spell it out nor suggest information so that an inference of how it was received could be made. Because of that, even if it did come from a CI, there is no way to assess that CI's veracity, basis of knowledge, or reliability. It is wholly lacking and cannot support a probable cause determination.

45. Next, CI#2 listed in the affidavit alleges first-hand knowledge of Redmond being in possession of, and selling, heroin and cocaine base. But, nothing within the four corners of the affidavit (or outside it for that matter) suggests that this CI has given reliable information in the past or addresses his/her veracity. CI#2 does not make any statements that expose him/her to criminal liability, such as that he bought or used some of the drugs from Redmond. Only his/her observations are listed. This does not bolster his/her credibility. Additionally, nothing is known about whether the CI offered this information in exchange for some benefit he/she received, or is hoping to receive, from the Augusta Police Department, or if this CI is a concerned citizen. Supporting CI#2's statements is his/her basis of knowledge, as the affidavit states that he/she personally observed Redmond with drugs. Because of the lack of detail about the informant and the information that the MDEA received about Kanaris, the probable cause question boils down to whether one believes the affidavit contains "something more" and that the MDEA corroborated this information sufficiently.

46. MDEA found that Redmond had been charged with unlawful possession of scheduled drugs a year prior, and that Clark was on conditions of release for violating conditions, though the underlying charge is unknown. Over the period of one day,[17] they observed Redmond with a pipe of the sort that is commonly used to smoke illegal substances, and saw that Redmond again drove a rental car. Rolfe left the Room twice and engaged in what the SAs believed to be drug transactions through a pickup and drop-off of a man after a drive around a block and when a man approached his drivers' side window and an "exchange" occurred. Nothing is listed as being seen passed between Rolfe and the man. Clark was seen getting a toilet paper roll and a clear plastic baggie out of the trunk Rolfe's car.

47. Omitting the facts about Wilson leaving the older Rolfe's apartment, probable cause is thin in this affidavit. Absolutely no information is provided about the CIs' veracity or reliability. The information that the CI gave was not very specific, just that he had seen Redmond engage in drug trafficking and possession of drugs at an apartment a few weeks prior. He did not state that Redmond used rental cars when trafficking, or that he would frequent hotels to conduct his business, or even that he knew Redmond had been charged in the past for unlawful possession. Essentially, there was nothing provided by this CI for the police to corroborate, and the MDEA is relying on Clark's and Rolfe's activity that they observed as "suspicious" as the "something more" that is required.

---

[17] Nothing in the affidavit states it was one day, but they were called by the Augusta Inn on the same day the warrant issued.

13

Unlike the detailed observations of the neighbors contained in the *Allard* affidavit, the observations of the hotel staff cannot be considered as "nonconfidential sources," because no specific observations were described in this affidavit.

48. At first glance this case may appear to be a close call, but only because of the deference owed to the judge issuing the warrant. Notwithstanding the deference owed, the typo in the date of birth of John Rolfe (if it is a typo), the lack of information on the veracity and reliability of the CI, and the lack of "something more", all support the Court's conclusion, after a positive reading of these facts in their totality, that it cannot be reasonably inferred that it was probable to find evidence of a crime or contraband within Room 209 or the vehicles, and thus that the affidavit lacked sufficient probable cause to issue.

49. The final question for the undersigned to answer is if the affidavit did not contain sufficient probable cause for the warrant to issue, does the good faith exception save the evidence? The State argues that even if the affidavit is not supported by probable cause, Kanaris's motion should be denied under the good faith exception to the exclusionary rule. The purpose of the exclusionary rule is to deter unlawful police conduct, so evidence from an unlawful search should only be suppressed when the officer had knowledge, "or may be properly charged with knowledge" that the search violated the Fourth Amendment. *United States v. Leon*, 468 U.S. 897, 919 (1984) (citing *United States v. Peltier*, 422 U.S. 531, 539 (1975)).

50. The good faith exception should apply if the affidavit "provide[s] evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause." *Leon*, 468 U.S. at 926. If police acted under the authority of a search warrant later found to be invalid for lack of probable cause, the good faith exception provides that the exclusionary rule does not apply so long as law enforcement acted in objectively reasonable reliance on the warrant. *Id.* at 922.

51. An officer's reliance on a subsequently invalidated search warrant is objectively unreasonable when: (1) the affiant knows, or is reckless in not knowing, that the warrant contains false information; (2) the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; (3) the affidavit is so lacking in indicia of probable cause that belief in its existence is objectively unreasonable; and (4) the warrant is so facially deficient that it could not reasonably be presumed to be valid. *Id.* at 923.

52. *Herring v. United States*, another Supreme Court case, more recently discussed the good faith exception and determined that

> [t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systematic negligence.

555 U.S. 135, 144 (2009).

53. Despite the above, the *Herring* Court also made clear that, "[w]e do not suggest that all recordkeeping errors by the police are immune from the exclusionary rule. In this case, however, the conduct at issue was not so objectively culpable as to require exclusion." *Id.* at 146. That case involved a defendant's motion to suppress evidence on the grounds that his arrest was illegal because law enforcement's computer systems had not been updated to reflect that the warrant had been recalled. *Id.* at 137-38.

54. The *Herring* Court also discussed negligence of police officers and explained that the defendant's claim that police negligence automatically triggers suppression cannot be squared with the principles underlying the exclusionary rule, as they have been explained in Supreme Court precedent. The court elaborated that

> [i]n light of our repeated holdings that the deterrent effect of suppression must be substantial and outweigh any harm to the justice system, we conclude that when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.' In such a case, the criminal should not 'go free because the constable has blundered.'

*Id.* at 147-48 (internal citations omitted).

55. In Maine cases considering the good faith exception, the Law Court has often determined that the affidavit was so lacking in probable cause that an officer could not reasonably rely on it, so the exception could not apply. *See State v. Johndro,* 2013 ME 106, 82 A.3d 820 (unreasonable for officer to rely on affidavit that described the only link between defendant and the crime as him driving his car in the area at the time which is "entirely noncriminal and unsuspicious on its own"); *State v. Diamond,*[18] 628 A.2d 1032 (Me. 1993) (affidavit was based on solely on

---

[18] *Johndro* described *Diamond* clearly. The undersigned is excerpting the explanation below as it is apt here. There was some suspicious activity in that case, but not enough for probable case.

> In *Diamond,* we concluded that, because an affidavit based entirely on noncriminal behavior contained no information from which to conclude that evidence of criminal activity would be found at the time of the search, officers' reliance on the warrant was not objectively reasonable. In that case, a drug enforcement agent learned from the federal Drug Enforcement Agency that a confidential source, whose information had already led to dozens of arrests for indoor marijuana growing operations, had relayed that Diamond had received four shipments from two companies identified as "A.G.S. Inc." and "Light Mfg." The affidavit did not specify that the informant suspected these companies of being suppliers of marijuana seeds or growing equipment. Further investigation revealed that tax assessors had been denied access to the inside of Diamond's residence, and that Diamond's monthly electricity use far exceeded that of a typical residential

noncriminal behavior, which suggested nothing to conclude that evidence of a crime would be found at the place to be searched, therefore the officers' reliance on the warrant was objectively unreasonable). Beyond this, the Law Court has not substantively addressed the good faith exception, instead finding on appeal that probable cause existed and therefore mooting the exception. The undersigned did not find other Superior Court cases addressing the good faith exception in any way that would be helpful here. However, going back to the Maryland *Greenstreet* case, after making its finding that probable cause did not exist within the four corners of the affidavit, the Court of Appeals proceeded to address whether the good faith exception could save the fruits of the search, despite the lack of probable cause in the affidavit. It discussed relevant portions of *Leon*,

> [n]oting that one purpose of the exclusionary rule is to alter the behavior of individual law enforcement officers and their departments to deter them from willful or negligent conduct depriving a defendant of some right, the [*Leon*] Court observed that this deterrent policy 'cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.'

898 A.2d 961, 976 (Md. 2006).

56. The *Greenstreet* Court determined that the good faith exception did not apply in that case, because the affidavit facially showed a period of eleven months between the trash seizure and the warrant request. *Id.* at 979. The only other information in the affidavit that was suggestive of drug sales at the residence were, one month prior to the warrant request, "anonymous and unestablished informants [that] had complained of noise and increased vehicular traffic at [the defendant's] residence." *Id.* The court focused on the fact that the affidavit did not address criminal activity ongoing in the present tense, and did not describe any additional surveillance closer in time to the warrant request. *Id.*

57. Because Maryland courts had long recognized the legal concept of staleness of probable cause, the Court of Appeals could not

> conclude that a reasonable, well-trained police officer executing the warrant would believe that the warrant authorized the search because the lack of probable cause [was] apparent on the face of the

---

customer. While conducting surveillance in a heavily wooded area surrounding Diamond's property, the agent was accosted by two dogs, which came from and returned toward the direction of Diamond's house, apparently to alert Diamond to the presence of strangers. A justice of the peace issued a search warrant based on these facts, and agents seized marijuana plants and indoor growing equipment from Diamond's house the same day. On these facts, we held not only that the affidavit failed to establish probable cause, but also that the good faith exception did not apply. We concluded that reasonable judges could not disagree that the affidavit, based solely on noncriminal behavior, failed to establish probable cause, and that the agent's reliance on the warrant was not objectively reasonable.

*State v. Johndro*, 2013 ME 106, ¶ 18, 82 A.3d 820 (internal citations omitted)

affidavit when the evidence giving rise to a belief in probable cause [was] a year old and [did] not indicate continuing criminal activity.

*Id.*

58. The court noted that the typo was missed by the issuing judge, but that error, which allowed a warrant with stale probable cause within the affidavit to issue, was "not a mere technical deficiency of the warrant or an immaterial error that should escape the notice of a reasonable well-trained officer as affiant either." *Id.* at 980. The court concluded by determining that exclusion of the evidence would further the purposes of the exclusionary rule, because no police officer could reasonably rely on the warrant due to the stale probable cause. *Id.*

59. In the case before this Court, it seems that the first and third instances enunciated in *Leon* could cause the good faith exception not to apply. Each is addressed briefly below.

**(1) The affiant knows, or is reckless in not knowing, that the warrant contains false information.**

60. Here, a fair argument is made that the officer was reckless in not knowing that that Rolfe had two date of births listed for him in the affidavit and request for the search warrant. The undersigned finds this is reckless, or grossly negligent, and not mere negligence because it is not one digit that is off with the date of birth, but instead, an entirely different month, day, and year, resulting in a 39-year age difference.[19] Nothing suggests that law enforcement confirmed that the Rolfe with two different DOBs was the same person, or whether it is a junior/senior issue. This is significant because Rolfe was one of the persons to be searched, and a significant part of the probable cause determination hinged on a known drug trafficker leaving the older Rolfe's apartment.

61. It is unknown if typos of this magnitude (if this is one) in search warrants are a systemic problem. But, this does seem to go beyond a "mere technical deficiency" or an "immaterial error." It is indeed true that "the Fourth Amendment is not a bulwark against typos." *United States v. Clark,* 754 F.3d 401, 411 (7th Cir. 2014). However, this is not merely a "typo." The undersigned finds it difficult to describe the unexplainable difference in dates of birth for "Rolfe" as merely a typographical error when a significant portion of the probable cause rests on a description of ostensibly one person with a 39-year difference in dates of birth given. It is also difficult for the Court to find "good faith" when the reader of the affidavit is asked to rely on barebones information from a "CI#2" (what happened to "CI#1"?) without any sort of proof of reliability or veracity of the CI.

62. Additionally, the undersigned finds that not applying the "good faith" exception in this case will serve as a deterrent to discourage "boilerplate" or "cut

---

[19] In its Supplemental Memorandum of Law the State does not address this argument as Kanaris has not alleged that information was included with reckless disregard of the truth.

and paste" affidavits. Moreover, not applying the exception here will encourage proof reading of affidavits before they are submitted, and supporting confidential informants' information with details about their reliability and veracity, or the "something more" that the Law Court has explained is required.

**(3) The affidavit is so lacking in indicia of probable cause that belief in its existence is objectively unreasonable.**

63. The same analysis above is applicable here to some extent. The discrepancy in Rolfe's date of birth, combined with the CI's lack of reliability and veracity, and that there is no explanation regarding how the MDEA "received information" about Kanaris trafficking drugs out of his Sidney home could cause the affidavit to be so lacking in indicia of probable cause that belief in its existence is objectively unreasonable. This is a harder argument to accept as an AAG reviewed the warrant and a judicial officer signed off on it. However, the undersigned is unclear that those implicit approvals are even considered in a good faith analysis. Instead, the analysis appears to consider that the affidavit as written is so deficient in probable cause that the officer should know it is objectively unreasonable to rely on it before it is presented to an AAG for review or to a judicial officer for issuance.

64. "There is always a temptation in criminal cases to let the end justify the means, but as guardians of the Constitution, we must resist that temptation." *Wheeler v. State*, 135 A.3d 282, 307 (Del. 2016). The Court finds the affidavit with its deficiencies noted above does **not** provide probable cause for the search warrant, and the good faith exception does not save the warrant. Accordingly, the Motion to Suppress is **granted.**

Date: 3/20/19

BY _____
Robert E. Mullen, Deputy Chief Justice
Maine Superior Court

Entered on the docket 3/21/19

18